**Clair BURKE, Plaintiff,**

v.

**DEERE & COMPANY, a/k/a John Deere Company, a Delaware Corporation, Defendants.**

**Civ. No. 86–66–W.**

United States District Court, S.D. Iowa, W.D.

Dec. 4, 1991.

---

Jack B. Sellers, Jack B. Sellers Law Associates, Inc., Sapulpa, Okl., Randall Shanks, Council Bluffs, Iowa, Craig Kelinson, Sp. Asst. Atty. Gen., Des Moines, Iowa, for plaintiff.

Philip Willson, Joseph Thornton, Smith, Peterson, Beckman & Willson, Council Bluffs, Iowa, Tim J. Harrington, Deere & Company, Moline, Ill., Richard J. Sapp, W. Don Brittin, Jr., Nyemaster, Goode, McLaughlin, Voigts, West, Hansell & O'Brien, Des Moines, Iowa, for defendants.

## ORDER

DONALD E. O'BRIEN, Chief Judge.

Defendant Deere & Company's (Deere) motion for judgment notwithstanding the verdict (jnov) and, in the alternative, motion for a new trial, bring this matter before the court. After careful consideration of the written and oral arguments of the parties, as well as extensive review of the transcript, trial notes, and exhaustive independent research, the court denies the motions. The court does however, find the award of $50,000,000 in punitive damages to be excessive and that the award should be remitted to $28,000,000.

FACTS

This products liability action was tried to a jury during a two-week period in November, 1990 and concluded in a jury verdict in favor of the plaintiff for $650,000 for actual damages. In doing so the jury found the plaintiff to be 40% at fault for his injuries and defendant Deere & Co. 60% at fault. This resulted in a net recovery for the plaintiff of $390,000. Special Interrogatories were submitted to the jury on the issue of awarding punitive damages. The jury found that Deere's conduct constituted willful and wanton disregard for the rights or safety of another and awarded punitive damages in the amount of $50,000,000. An additional special interrogatory was submitted to the jury pursuant to Iowa Code § 668A which asked if the conduct of Deere & Co. was directed specifically at Clair Burke. The jury answered that it was not. Following the trial Deere filed these motions for a new trial and for judgment notwithstanding the verdict.[1]

This is the second case this court has had before it involving the John Deere Titan series combine. The first case of *Christopherson v. Deere*, Civil No. 86–67–W, 1990 WL 324300 (S.D.Iowa), was tried to a jury during a two-week period in the month of August, 1989. The *Christopherson* case was tried by the same plaintiff's and defendant's counsel. That matter concluded in a plaintiff's verdict which has subsequently been affirmed by the Eighth Circuit Court of Appeals in *Christopherson v. Deere*, 941 F.2d 692 (8th Cir.1991).

In the *Christopherson* case, as in the case at hand, the parties before trial entered into an extensive stipulation of undisputed facts.[2] The court finds a recitation of this stipulation most useful when reviewing the motions now before the court,

and now sets out portions of said stipulation.[3]

Commencing in October of 1978, Deere & Company introduced into the market its Titan Series Combines designed with a closed unloading system which functioned, basically, as follows:

Two cross augers in the bottom of the grain tank would push the grain into a sump, with an angled floor, whereby the grain would flow down to a vertical auger which would carry the grain straight up, to a horizontal auger which would, in turn, convey the crop out to a waiting storage cart or truck. At the base of the vertical auger, there was a clean-out door approximately 5 inches by 6 inches in size which was accessible from the ground for use in cleaning the grain residue out of the grain tank sump and vertical unloading auger. When seated in the operator's seat in the combine cab, the operator cannot see the lower clean-out door for the vertical auger.

This configuration was substantially different from Deere's old series, the New Generation combines, which had no vertical auger or sump, nor a horizontal auger. The New Generation combines had a discharge auger which attached at the bottom left center of the grain tank. When in position for discharge, it angled out and up at an approximate 45–degree angle. The angled discharge auger was hinged where it attached to the grain tank and when folded back against the side of the combine for transport, the circular hole, where grain feeds from the tank into this auger, was exposed, also exposing one of the cross augers in the tank.

In August of 1979, Deere & Company was notified that an individual had suffered a hand injury while in the process of at-

---

1. Following the trial the parties jointly agreed that the briefing deadlines on post-trial motions be extended in order to obtain a written transcription of the record. The court found this to be a reasonable request and granted that motion. Following the expiration of deadlines on briefs, the court set this matter for oral argument. A number of scheduled hearing dates were canceled due to a conflict on the part of counsel for both parties.

2. The entire final pretrial stipulation is found at clerks memorandum of papers # 111.

3. From this point through the 1st full paragraph on page 1234, all of the text is pertinent portions from the stipulation.

tempting to clean out a clogged vertical unloading auger at the lower clean-out door. In this instance, the individual reportedly had left the power to the auger engaged, but due to crop residue which had hardened in the vertical unloading auger, the auger was not turning. Upon cleaning of a portion of the crop residue, the auger began to turn slowly, resulting in injury to the individual's hand.

The factory which produced all of the Titan combines was Deere & Company's John Deere Harvester Works in East Moline, Illinois. There was at the John Deere Harvester Works a Product Safety Committee whose function, among other things, was and is to review accidents reported to the company involving equipment manufactured at the John Deere Harvester Works, including combines. The Product Safety Committee consists of employees of Deere & Company, including, but not limited to, the Product Safety Coordinator, the Factory Service Manager, the Division Engineer, New Combine Design, the Supervisor of Service Publications and Technical Writings, the Manager of Test and Evaluation Engineering and the Manager of Product Reliability, or their alternates.

The Safety Committee reviewed the information relating to the accident it had been notified of in September of 1979. The committee recommended that the Operator's Manual for Titan Combines be reviewed, as well as the caution decal mounted on the side of the combine, approximately 3 feet to the rear of the lower clean-out door of the vertical auger.

On February 29, 1980, Deere & Company was notified of an accident involving David Johnson. It was reported that Mr. Johnson was removing crop residue from the vertical auger shaft at the lower clean-out door when his brother, who was in the operator's cab, started the unloading auger, resulting in the amputation of Mr. Johnson's left arm. This accident was discussed at the Product Safety Committee meeting on April 2, 1980 and the committee recommended that the Design Division review the design for a possible way to minimize the hazard and that a decal be adopted to

be placed above the clean-out door as an interim measure.

On September 26, 1980, Deere was notified that a Mr. Mitchell suffered an injury to his right arm while cleaning crop residue from the grain tank sump of a Titan Combine when another person turned on the vertical auger while Mr. Mitchell had his hand in the lower clean-out door for the vertical auger.

On November 5, 1980, the Product Safety Committee approved a warning decal to be placed above the lower clean-out door of the vertical auger. The decal was to be placed on machines being manufactured beginning in January of 1981.

On December 11, 1980, Deere & Company was notified of an accident involving Mr. Roger Herring. It was reported to Deere that Mr. Herring had been involved in cleaning out crop residue from the grain tank sump and vertical auger at the lower clean-out door of the vertical auger. He reportedly had his hand through the lower clean-out door when another person engaged the vertical auger, causing an injury to Mr. Herring's right hand and arm.

On January 5, 1981, a new warning decal was made standard equipment and placed on all combines produced after that date, above the lower clean-out door of the vertical auger.

On January 14, 1981, the Product Safety Committee at the John Deere Harvester Works agreed that the new decal should be mailed to all customers who had purchased a Titan Series Combine prior to January 5, 1981. On February 25, 1981 the Product Safety Committee observed a proposed design change in the lower clean-out door of the vertical unloading auger. This proposed change consisted of a clean-out door located in the floor of the grain tank sump, forward of the vertical auger. The clean-out door at the rear of the vertical auger tube was closed down to approximately one inch high. The committee agreed that the proposed design should be tested.

In March of 1981 the new decal was adopted as Modification Program No. H104. On Approximately April 12, 1981 the new warning decal and a letter accom-

panying it were sent to all customers who had purchased Titan Series Combines prior to January 1981, as well as to all dealers who had combines purchased for their inventory on their lots.

On July 9, 1981, it was reported to Deere & Company that on or about June 18, 1981, Mr. Leon Karst had suffered a hand injury in the course of cleaning out the grain tank sump through the lower clean-out door of the vertical unloading auger. It was reported that someone else had engaged the vertical unloading auger drive while Mr. Karst's hand was inserted through the door, into the vertical auger and sump area.

On October 8, 1981, the proposed design change first presented to the Product Safety Committee in February of 1981 was approved for production, with the addition of a trimming of the auger flighting on the vertical auger at the lower end. This change (Deere Engineering Decision # 89031H) was to occur on the production line effective March 1, 1982. Since, with the new design, there would be two clean-out doors, the narrow door at the rear of auger tube and the large door in the floor of sump leading to the vertical unloading auger, the decal issued in January of 1981 was changed to reflect that there were two doors instead of a single door. The decision to adopt the new design and change the decal were given final approval by the Safety Committee on December 2, 1981, to be incorporated into machines manufactured commencing March 1, 1982.

On February 12, 1982, Deere & Company was notified that in October 1981, Mr. Leo

Cole was injured while cleaning his Titan Series Combine out with the engine running. It was reported that he put his hand into the vertical auger housing to clean out wet soybeans, through the lower clean-out door of the vertical auger, when the operator of the combine engaged the auger, causing injury to Mr. Cole's right hand.

Commencing on March 1, 1982, the production line at the John Deere Harvester Works began assembling all future combines with the revised design for the lower clean-out door of the vertical auger and grain tank sump.

On or about August 2, 1982, Deere & Company was notified of an accident which reportedly occurred on July 5, 1982, involving one Albert Ferens. Reportedly, Mr. Ferens was cleaning out the grain tank sump through the vertical auger's lower clean-out door when a helper engaged the auger drive, resulting in injury to Mr. Ferens' right arm. Mr. Ferens' combine had the factory updated decal, which had been used since January of 1981, above the clean-out door.

In the period from September of 1982 until March of 1983, Deere & Company was notified of six additional accidents at the lower clean-out door of the vertical unloading auger on Titan Series Combines where the persons reportedly injured had each been reaching through the lower clean-out door of the vertical auger, with the combine's engine running, cleaning out crop residue, when another person then engaged the vertical auger, causing injuries to the hands or arms of the persons so involved, as follows:

| Injured Person | Accident Date | Date of Notice to Deere |
|---|---|---|
| Hanna | 10/25/82 | 11/01/82 |
| Chaney | 06/29/82 | 09/14/82 |
| Marple | 11/01/82 | 01/10/83 |
| Boucher | 08/11/82 | 01/17/83 |
| Wheeler | 09/14/81 | 09/20/82 |
| Melton | 10/12/82 | 03/07/83 |

While Deere & Company was not notified of the Boucher, Marple and Melton accidents until 1983, all of the six accidents, with the exception of Mr. Wheeler's accident, had occurred in the period from July through November 1982. Mr. Wheeler's accident occurred in September 1981, but Deere & Company was not notified of it until September 20, 1982. The combines involved in the accidents involving Mr. Hanna, Mr. Boucher, Mr. Marple, and Mr. Melton all had the factory decal, placed above the clean-out door, issued in January of 1981, installed on the combine during production. Mr. Melton claimed that the decal above the clean-out door had been obscured by mud at the time of his accident. The combines involved in the Wheeler and Chaney accidents did not have such a decal above the lower clean-out door.

Two accidents at the lower clean-out door occurred during the calendar year 1983. In each case, the person injured had his hand extended into the lower clean-out door of the vertical auger in the process of cleaning out crop residue from the grain tank sump when a second person engaged the auger, causing injury to the arm or hand. The two parties so injured were Timothy Giesbrecht, whose accident reportedly occurred on August 29, 1983 and was reported to Deere on September 16, 1983, and Mr. Walter Lockley, who was reportedly involved in his accident on October 10, 1983 though Deere & Company had no knowledge of his accident until March 21, 1984. Mr. Giesbrecht's combine, though it had been built in 1980 and did not have the decal above the clean-out door in production, did have a decal above the clean-out door at the time of his accident. Mr. Lockley's combine reportedly did not have the decal above the clean-out door, having been manufactured in 1979.

On May 9, 1984, the John Deere Harvester Works Product Safety Committee reviewed the Lockley and Giesbrecht accidents and agreed that the revised design which had been installed in the factory on machines manufactured since March of 1982, be field installed on all combines produced before March 1982 (Product Improvement Program H401). On June 22, 1984, Deere & Company announced to all of its dealers and by letters to customers that the Titan Series Combines built before March 1, 1982 should be modified and the revised design installed under Deere's Modification H401. The revision of the pre-March 1982 combines was to be at Deere's expense.

From July 1984 through November 1984, Deere & Company was notified of eight additional accidents. The persons injured were Messrs. Hillman, Stotler, Gannon, Christopherson, Ball, Obermeyer, Burke and Pierce. Of these eight accidents, six had occurred in the period from September through November 1984, while two, Mr. Stotler's accident and Mr. Hillman's accident, had occurred previously. Mr. Hillman's accident reportedly took place in July of 1982 and was reported to Deere on July 23, 1984. Mr. Stotler's accident took place in September of 1981 and was reported to Deere on October 29, 1984.

Deere & Company was advised of one further accident on June 17, 1985 involving a Mr. Muffett which was reported to have occurred on or about November 10, 1984, and in 1986, of a final accident involving Johnny Adams, which accident had occurred on October 30, 1980, though Deere & Company was not advised of it until November 30, 1986. None of these last ten accidents occurred on a combine which had the modifications installed, to Deere's knowledge, except Mr. Muffett's combine, which, although it had not had a decal installed above the clean-out door in production, having been built prior to 1981, reportedly did have a decal placed at the clean-out door some time thereafter which, reportedly, had been painted over at the time of his accident. Each accident involved a person who was reaching through the lower clean-out door of the vertical auger, of the original design, when a second person engaged the auger drive, resulting in the auger contacting and injuring the arm or hand of each party.

Approximately 37,177 combines were built prior to March 1, 1982 with the original design that were, therefore, eligible to be revised with the updated design. As set out in the stipulation, 26 people had been injured in substantially similar accidents at the same lower clean-out door.[4]

## DISCUSSION

### JUDGMENT NOTWITHSTANDING THE VERDICT.

Deere moves for judgment notwithstanding the verdict on the following grounds of alleged error:

(1) The judgment for punitive damages is grossly excessive, unconscionable and shocks the conscience, and is a result of passion and prejudice.

(2) The judgment for punitive damages violates the following clauses of the Constitution of the United States, the Fifth, Eighth and Fourteenth Amendments, and the Constitution of the State of Iowa:

(a) The due process clauses of the Fifth and Fourteenth Amendments;

(b) The equal protection clause of the Fourteenth Amendment to the United States Constitution;

(c) The excessive fines and cruel and unusual punishment clauses of the Eighth Amendment to the United States Constitution and Article I, Section 17 of the Iowa Constitution;

(d) The double jeopardy and self incrimination clauses of the Fifth Amendment to the United States Constitution and the double jeopardy clause of Article I, Section 12 of the Iowa Constitution;

(e) The ex post facto clause of Article I, Section 10 of the United States Constitution and Article I, Section 21 of the Iowa Constitution.

(3) The court erred in submitting the issue of punitive damages to the jury when there was insufficient admissible evidence of any willful and wanton conduct by Deere.

(4) The court erred in submitting the issue of failure to warn where the danger was open and obvious and plaintiff had actual knowledge of the danger, and in failing to direct a verdict on the basis that as a matter of law any lack of warnings was not the proximate cause of plaintiff's injury.

(5) The court erred in failing to direct a verdict on strict liability for defective design for the reason that the product was not unreasonably dangerous as a matter of law, and that any unreasonably dangerous condition was not the proximate cause of plaintiff's injury.

(6) The court erred in permitting the jury to impose liability on Deere for post-sale conduct concerning warnings and product modification programs in the absence of any legal duty to recall or modify products previously sold.

(7) Even if a duty to make post-sale modifications were found, notification of the owner and dealer of the modification program and providing the dealer with the parts necessary for modification fulfilled any duty to recall or make post-sale modifications as a matter of law.

(8) The court erred in permitting live and deposition testimony of other injured persons and owners.

(9) The verdict was against the weight of the evidence.

### MOTION FOR NEW TRIAL.

Deere moves for a new trial on the following grounds of alleged error:

(1) The judgment for punitive damages is grossly excessive, unconscionable and shocks the conscience, and is a result of passion and prejudice.

(2) The judgment for punitive damages violates the following clauses of the Constitution of the United States: the Fifth, Eighth and Fourteenth Amendments,

---

4. Prior to the Burke accident, 22 persons had been injured. Subsequent to the Burke accident, 3 additional persons have been injured in a similar manner. The evidence also revealed that 1 person had been injured in an accident around the clean-out door; however, it was not similar in manner. In total, this equals 27 persons injured, 26 in a substantially similar manner.

and the Constitution of the State of Iowa:

(a) The due process clauses of the Fifth and Fourteenth Amendments;

(b) The equal protection clause of the Fourteenth Amendment to the United States Constitution;

(c) The excessive fines and cruel and unusual punishment clauses of the Eighth Amendment to the United States Constitution and Article I, Section 17 of the Iowa Constitution;

(d) The double jeopardy and self incrimination clauses of the Fifth Amendment to the United States Constitution and the double jeopardy clause of Article I, Section 12 of the Iowa Constitution;

(e) The ex post facto clause of Article I, Section 10 of the United States Constitution and Article I, Section 21 of the Iowa Constitution.

(3) The court erred in submitting the issue of punitive damages to the jury when there was insufficient admissible evidence of any willful and wanton conduct by Deere.

(4) The court's Jury Instructions Nos. 34–36 and verdict form on punitive damages are in error based on the following grounds:

(a) The instructions failed to properly instruct on the required standard of proof;

(b) The instructions failed to adequately instruct that the jury may, but need not, award punitive damages;

(c) The instructions omit the requirement that the amount of punitive damages awarded must bear a reasonable relationship to plaintiff's compensatory damages;

(d) The instructions fail to give the jury adequate guidance regarding the factors to be considered in determining the proper amount of punitive damages;

(e) The instructions failed to instruct the jury that they could not consider evidence of post-sale or post-accident conduct of Deere on the issue of punitive damages;

(f) Instruction No. 36 is inconsistent with Instruction No. 34, is one-sided, argumentative, and incorrectly states the applicable law in omitting reference to the requirement that the conduct must be willful and wanton, in referring to and failing to define "inherently dangerous."

(g) The verdict form improperly advised the jury of the effect of its answer to special interrogatory No. 3 on punitive damages and incorrectly advised the jury if they answered "no," a portion of the punitive damages award would be paid into a civil trust fund administered by the court.

(5) The court erred in admitting post-sale and post-accident evidence of Deere's conduct on the issue of punitive damages when such evidence was not relevant to Deere's state of mind or motive at the time of the acts upon which liability to plaintiff is based.

(6) The court erred in permitting the jury to impose liability on Deere for post-sale conduct concerning warnings and product modification programs in the absence of any legal duty to recall or modify products previously sold.

(7) The court erred in failing to instruct on Deere's requested specifications of plaintiff's negligence, especially where the marshalling instruction told the jury these specifications were explained in other instructions, but were not, and in failing to instruct the jury on plaintiff's duty to exercise reasonable care for his own safety.

(8) The court erred in permitting irrelevant and prejudicial evidence of post-accident conduct of independent dealerships, and permitting the jury to impose liability on Deere for acts or omissions of these dealerships in the absence of any proof of an agency relationship sufficient to establish vicarious liability and without any instruction as to what must be established to prove an agency relationship or vicarious liability for punitive conduct.

(9) The court erred in its instructions on key elements of plaintiff's sole theory

of strict liability, specifically, the definition of unreasonably dangerous, the duty to warn, and the failure to instruct as to the effect of open and obvious dangers.

(10) The court erred in submitting the issue of failure to warn where the danger was open and obvious and plaintiff had actual knowledge of the danger.

(11) The court erred in permitting irrelevant, improper, and prejudicial lay opinion testimony.

(12) The court erred in permitting irrelevant, improper, and prejudicial expert opinion testimony, including testimony on matters which are not the proper subject of expert testimony.

(13) The court erred in admitting deposition and trial testimony of witnesses from other lawsuits, who did not testify in the present case, who were not unavailable within the meaning of Federal Rule of Evidence 804.

(14) The court erred in receiving into evidence a selected excerpt from Deere safety policy statement.

(15) The court erred by permitting reference by plaintiff's counsel to punitive damages and Deere's net worth in opening statement, and in generally permitting comment upon the evidence of Deere's post-sale conduct prior to the time the court determined plaintiff had established a sufficiently submissible prima facie case as required by Iowa Code § 668A.1(3), and in permitting improper closing argument including a "golden rule" argument.

(16) The court erred in failing to instruct the jury that the condition of the combine and Deere's liability was to be judged solely as of the time of the initial sale of the combine in 1980.

(17) The court erred in permitting live and deposition testimony of the other injured persons and owners.

(18) The court erred in submitting future medical expenses as an element of plaintiff's damages where there was insufficient evidence to support submission of them.

(19) The court erred in giving an erroneous, prejudicial and argumentative jury instruction on pain and suffering which overemphasized this element of damages.

(20) The verdict is against the weight of the evidence.

Federal Rule of Civil Procedure 59, in pertinent part provides that:

A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

▮▮▮ This court, in reviewing a motion for new trial, is not required to view the evidence in the light most favorable to the non-movant; rather, it may weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict. *Ouachita National Bank v. Tosco Corp.*, 686 F.2d 1291 (8th Cir.1982). The authority to grant a new trial is confided almost entirely to the exercise of discretion on the part of the trial court. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980). A motion for new trial should be granted when the moving party has met his burden of showing either that prejudicial error has been committed or substantial justice has not been achieved. *Midcontinent Broadcasting Co. v. North Central Airlines, Inc.*, 471 F.2d 357, 359 (8th Cir.1973); *Marcoux v. Midstate Livestock, Inc.*, 429 F.Supp. 155 (N.D.Iowa 1977).

The court will honor the requests of counsel and address each of the specific points of error. (June 27, 1991, Hearing Tr. at 159–60) [5]

## I. Judgment Notwithstanding the Verdict.

The test for evaluating a motion for j.n.o.v. in this circuit is as follows:

Both the trial court and this court must (a) consider the evidence in the light most

---

5. The court is well aware of the fact that ruling is excessively long because of the request to address each of the many contended points of error.

favorable to the prevailing party, (b) assume that the jury resolved all conflicts of evidence in favor of that party, (c) assume as true all facts which that party's evidence tended to prove, (d) give that party the benefit of all favorable inferences which may reasonably be drawn from proved facts, and (e) deny the motion if in light of the above reasonable jurors could differ as to the conclusions that could be drawn from the evidence.

*McGee v. South Pemiscot School Dist. R–V*, 712 F.2d 339, 343 (8th Cir.1983) (citations omitted).

(1) The judgment for punitive damages is grossly excessive, unconscionable and shocks the conscience, and is a result of passion and prejudice.

■ Although state law principles govern in establishing whether punitive damages are available for a state law claim, *Kerr v. First Commodity Corp.*, 735 F.2d 281, 289 (8th Cir.1984), the proper role of the federal courts in reviewing the size of jury verdicts is a matter of federal law. *Donovan v. Penn Shipping Co., Inc.*, 429 U.S. 648, 649, 97 S.Ct. 835, 836–37, 51 L.Ed.2d 112 (1977); *American Business Interiors, Inc. v. Haworth, Inc.*, 798 F.2d 1135 (8th Cir.1986).

The United States Supreme Court stated in *Browning–Ferris Industries v. Kelco Disposal, Inc.*, 492 U.S. 257, 279, 109 S.Ct. 2909, 2922, 106 L.Ed.2d 219 (1989), the standard for review of a punitive damage award.

In reviewing an award of punitive damages, the role of the District Courts is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered. The Court of Appeals should then review the District Court's determination under an abuse of discretion standard. Although petitioners and their *amici* would like us to craft some common-law standard of excessiveness that relies on notions of proportionality between punitive and compensatory dam-

ages, or makes reference to statutory penalties for similar conduct, these are matters of state, and not federal, common law. Adopting a rule along the lines petitioners suggests would require us to ignore the distinction between the state law and federal law issues. For obvious reasons we decline the invitation.

■ The primary focus when reviewing a punitive damage award in Iowa is the relationship between the punitive damage award and the wrongful conduct of the offending party. *Ryan v. Arneson*, 422 N.W.2d 491, 496 (Iowa 1988). To determine if the award is a result of prejudice and passion, the trial judge should "consider whether the punitive damages award is reasonably related to the malicious conduct of the defendant which resulted in actual injury or damage to the plaintiff." *Id.* at 496.

■ Exemplary [punitive] damages are in no way intended to be compensatory. There is no set mathematical ratio between actual and exemplary damages. Exemplary damages are intended to punish the defendant and deter others from similar wrongdoing. To be effective in this purpose, the exemplary damages awarded must be relatively large. *Northrup v. Miles Homes, Inc. of Iowa*, 204 N.W.2d 850 (Iowa 1973). Punitive damages exist to punish the defendant and to deter the offending party and like-minded individuals from committing similar acts. *Ryan v. Arneson*, 422 N.W.2d 491, 496 (Iowa 1988).

Although Iowa cases have discussed a relationship between actual and punitive damages, the Iowa Supreme Court has expressly rejected the use of a mathematical ratio in examining punitive damages as they relate to actual damages. Furthermore, Iowa cases have stated that legal precedent is of limited value in evaluating the damage award of a specific case. *Ryan v. Arneson*, 422 N.W.2d 491, 496 (Iowa 1988).

In *Hale v. Firestone Tire & Rubber Company*, 820 F.2d 928, 936 n. 1 (8th Cir. 1987), the Court of Appeals noted that:

Missouri has abolished the use of remittitur noting that the practice is fraught with confusion and inconsistencies. *Firestone v. Crown Center Redevelopment Corp.*, 693 S.W.2d 99, 110 (Mo. 1985). It has been challenged as an invasion of a party's right to weigh the evidence. *Id.* The Missouri Supreme Court, therefore, concluded that given the broad discretion of the trial court to order a new trial where the verdict is against the weight of the evidence, remittitur practice is unnecessary and wasteful. *Id.* This Court is not bound by the *Firestone* decision since remittitur is largely a procedural issue, and question of whether to grant a new trial is a federal procedural question to be decided by reference to federal law. *Ferren v. Richards Mfg. Co.*, 733 F.2d 526, 528 (8th Cir.1984).

▬ The Eighth Circuit Court of Appeals has stated that the general rule is that where a punitive damage award is the result of passion and prejudice, a new trial is required and that a remittitur is not an appropriate remedy. *See, Hale v. Firestone Tire & Rubber Company*, 820 F.2d 928, 936 (8th Cir.1987).

▬ Accordingly, this court must answer the question, based upon the record as a whole, was the punitive damage award a result of passion and prejudice? After reviewing the transcript and trial notes, this court concludes that it was not. Upon answering this question, the next logical step is to determine if the punitive damage award was excessive.

In order to review this issue the court must keep in mind the public policy behind punitive damages: to obtain the attention of the defendant and to deter similar willful and wanton conduct. With this policy factor in mind, the court finds that the $50,000,000 punitive damage award against a company with a net worth of $2,780,330,-000 [6] more than accomplished this purpose. It is clear that the jury wanted to send a message to Deere that this type of conduct will not be tolerated in Iowa. The court in addition finds that this same message can

be delivered to Deere with the same force and effect if it is reduced to $28,000,000. In making this reduction, the court is not finding that the verdict was a result of passion and prejudice, it is merely finding that a substantial message can be delivered for $22,000,000 less than the jury's award. The award was excessive. A sum of approximately 1% of Deere's net worth plus estimated trial expenses is realistic and appropriate under the circumstances. Accordingly, this portion of the motion for judgment notwithstanding the verdict is denied.

(2) The judgment for punitive damages violates the following clauses of the Constitution of the United States, the Fifth, Eighth and Fourteenth Amendments, and the Constitution of the State of Iowa:

(a) The due process clauses of the Fifth and Fourteenth Amendments;

▬ Under *Pacific Mutual Life Insurance Co. v. Haslip,* —— U.S. ——, 111 S.Ct. 1032, 1044–45, 113 L.Ed.2d 1 (1991), this court must evaluate both the jury instructions as to the punitive damages award and the adequacy of judicial review of the jury's award. *Robertson Oil Co. Inc. v. Phillips Petroleum Co.*, 930 F.2d 1342, 1346 (8th Cir.1991).

In finding no constitutional violation, the Supreme Court in *Haslip, supra,* was considering Alabama law, and considered the following factors significant: (1) the jury was instructed that the purpose of punitive damages was to punish the defendant and to deter similar conduct so that its discretion was not unlimited; (2) the Alabama Supreme Court has established post-trial procedures for scrutinizing punitive awards, enumerating certain factors for the trial court to consider in reviewing a verdict for excessiveness; (3) the Alabama Supreme Court also reviews an award by applying "detailed substantive standards" to ensure that the award is reasonable in amount and rational in light of its purpose. *Haslip*, 111 S.Ct. at 1032, 1044–45.

6. The stipulation as to Deere's net worth can be found at Tr. 1253–54.

In *Haslip*, the Supreme Court held the award of punitive damages does not violate due process if it is reasonable in its amount and rational in light of its purpose. This court reviewed the instruction given to the jury regarding punitive damages. The court finds that holding from *Haslip* enlightening in this area. The United States Supreme Court found:

> The trial court expressly described for the jury[7] the purpose of punitive damages, namely, "not to compensate the plaintiff for any injury" but "to punish the defendant" and "for the added purpose of protecting the public by [deterring] the defendant and others from doing such wrong in the future."
>
> * * * * * *
>
> To be sure, the instructions gave the jury significant discretion in its determination of punitive damages. But that discretion was not unlimited. It was confined to deterrence and retribution, the state policy concerns sought to be advanced. And if punitive damages were to be awarded, the jury "must take into consideration the character and the degree of the wrong as shown by the evidence and necessity of preventing similar wrong." App. 106. The instructions thus enlightened, we believe, reasonably accommodated Pacific Mutual's interest in rational decision making and Alabama's interest in meaningful individualized assessment of appropriate deterrence and retribution. The discretion allowed under Alabama law in determining punitive damages is no greater than that pursued in many familiar areas of the law as for

example, deciding "the best interests of the child," or "reasonable care," or "due diligence," or appropriate compensation for pain and suffering or mental anguish. As long as the discretion is exercised within reasonable constraints, due process is satisfied.

*Haslip*, 111 S.Ct. at 1044. (footnote 7 added to inform of the specific language of the instruction)

This court's punitive damage instruction was Instruction No. 34 (Iowa Civil Jury Instruction 210.1), which states as follows:

> Punitive damages may be awarded if the plaintiff has proven by a preponderance of the evidence the defendant Deere's conduct constituted a willful and wanton disregard for the rights or safety of another and caused actual damage to the plaintiff.
>
> Punitive damages are not intended to compensate for injury but are allowed to punish and discourage the defendant Deere and others like conduct in the future. There is no exact rule to determine the amount of punitive damages, if any, you should award. In fixing the amount of punitive damages, you may consider all the evidence including:
>
> 1. The nature of defendant's conduct.
>
> 2. The amount of punitive damages which will punish and discourage like conduct by the defendant in view of its financial condition.
>
> 3. The plaintiff's actual damages.

The main difference in the two instructions is that it appears that the instruction given in *Haslip* was an oral instruction,

7. The instruction given to the jury in *Haslip*, is found at N1 of the opinion. It states as follows:

> Now, if you find that fraud was perpetrated then in addition to compensatory damages you may in your discretion, when I use the word discretion, I say you don't have to even find fraud, you wouldn't have to, but you may, the law says you may award an amount of money known as punitive damages.
>
> This amount of money is awarded to the plaintiff but it is not to compensate the plaintiff for any injury. It is to punish the defendant. Punitive means to punish or it is also called exemplary damages, which means to make an example. So, if you feel or not feel, but if you are reasonably satisfied from the

evidence that the plaintiff, whatever plaintiff you are talking about, has had a fraud perpetrated upon them and as a direct result they were injured and in addition to compensatory damages you may in your discretion award punitive damages. Now, the purpose of awarding punitive or exemplary damages is to allow money recovery to the plaintiffs, it does to the plaintiff, by way of punishment to the defendant and for the added purpose of protecting the public by detering [sic] the defendant and others from doing such wrong in the future. Imposition of punitive damages is entirely discretionary with the jury, that means you don't have to award it unless this jury feels that you should do so.

and this court's instruction was in written form. Otherwise Instruction No. 34 informs the jury that they "may" award punitive damages; it informs them that punitive damages are not intended to compensate for injury but are allowed to punish and discourage similar conduct. Instruction No. 34 further provided guidance to the jury in that it instructs them that they "may" consider the nature of the defendant's conduct, the amount they perceive will punish and discourage similar conduct, and that they may take into consideration the plaintiff's actual damages.

After a review of the instruction given in *Haslip*, and the instruction given here, the court finds that adequate protection was given to Deere's Due Process rights. In reaching this conclusion the court has considered *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95 (4th Cir.1991), a case called to this court's attention by defense counsel after submission of this matter. The court finds this case distinguishable. As found above, the punitive damage instruction in this case provided as much, if not more, due process protection as the instruction in *Haslip*. The Fourth Circuit Court of Appeals found that the South Carolina punitive damage instruction as used in *Mattison*, failed to meet the *Haslip* requirements, we agree with their finding. Our instruction meets the *Haslip* test. The *Mattison* instruction does not. These cases are distinguishable.

Further in *Haslip* the process required for an Alabama trial court when reviewing an award of punitive damages was spelled out:

(a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; (b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the

"financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanction on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.

*Haslip*, 111 S.Ct. 1032, 1045.

The court will briefly examine the *Haslip* factors at this time as they are discussed in detail throughout the body of this order.

(a) Whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred.

The evidence presented at the time of the trial indicated that at least 27 persons had been injured while working on the Titan series combine. Further evidence showed that a true and accurate number of those actually injured on the Titan series may never be known. The court concludes that a punitive damages award of $28,000,000 bears a reasonable relationship to the harm resulting from defendant's conduct.

(b) The degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct.

Evidence was presented at trial that Deere first became aware of this danger in August, 1979, upon receiving an accident report of a mechanic at the Evergreen dealership. Over the next several years Deere receive more reports of injuries involving the vertical unloading auger. Deere's safety committee, upon learning of the Evergreen accident, recommended the placement of a decal on the unloading auger housing. In April, 1981, almost two years after first discussion of the placement of the warning decal, Deere mailed a decal to all combine owners. These letters failed to fully explain the nature of the danger to the combine owners.

The evidence at trial was that Deere approved a modification in the design of the clean-out door in the unloading auger

and made the change on the production line in March, 1982. At this time Deere had 3,100 combines in the "pipeline", that is, machines that had been manufactured but not yet sold. These machines did not receive the protective changes at that time. They were ignored. It was not until May, 1984, some 26 months later, that Deere decided to extend the revised design to include all combines in the field that were produced before March, 1982. At that time the H401 retrofit program was introduced. This was the program in which Deere attempted to have all the "old" type lower clean-out doors on the vertical unloading auger area modified. As mentioned, this program started two years and two months after Deere had changed the design on the new combines made at the factory. Evidence presented at trial raised a question for the jury as to whether or not this delay was motivated by a savings to Deere of approximately $2,700,000. The jury's verdict supports a finding that the jury at least in part found Deere's delay in making a retrofit package available was due in part to economic motivations. *See* Exhibit No. 29(f) (cost of H401); Exhibit No. 29(b) (cost of H104).

(c) The profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss.

As mentioned above, the decision of Deere to change only the production line models of the Titan series combine was shown to save Deere about $2,700,000. The evidence showed that these combines cost anywhere from $50,000 to $80,000 each, depending on the accessories. A delay in selling the 3,100 pipeline machines, for the purpose of modifying them, would surely have cost Deere a great deal of money. The punitive damage award of $28,000,000 is in accord with the desirability of removing the profit from Deere's bad conduct.

(d) The "financial position" of the defendant.

As discussed in further detail elsewhere in this order, the court finds that a punitive damage award of $28,000,000 imposed on a company whose net worth is $2,780,330,000 is in line with the public policy behind punitive damage awards. Although an award of $28,000,000 is a sizeable award, it constitutes only 1.007% of Deere's net worth.

(e) All the costs of litigation; (f) The imposition of a criminal sanction on the defendant for its conduct; and (g) The existence of other civil awards against the defendant for the same conduct.

In general, cases of this magnitude and age involve substantial legal expenses. This factor has been taken into consideration by the court. This court is not aware of any type of criminal sanctions applicable to this matter. Finally, the court after consultation with counsel is unaware of any other punitive damage award involving this machine and this type of injury. Accordingly, the court does not find that (f) and (g) are significant factors. These factors are sometimes approved to mitigate damages, but as they are not present in this case, such an evaluation of a possible setoff was unnecessary.

Deere also has a violation of equal protection claim.

(b) The equal protection clause of the Fourteenth Amendment to the United States Constitution;

██ The equal protection claim must fail because Deere has not alleged that it was treated differently because of race, ethnicity, gender, or any other suspect classification, and its right to be free from punitive damage awards is not among the small set of rights fundamental enough to warrant protection under the equal protection clause.

There exists a rational basis for punitive damages awards and the world's largest farm implements manufacturer is hardly in a class that has traditionally been discriminated against. Accordingly, this portion of the motion for judgment notwithstanding the verdict is denied.

(c) The excessive fines and cruel and unusual punishment clauses of the Eighth Amendment to the United States Constitution and Article I, Section 17 of the Iowa Constitution;

■ Deere argues that under Iowa Code § 668A.1(2), which provides that if the defendant's conduct was not directed specifically at the plaintiff, the punitive damages award is to be divided into two parts, with 25% of the award to be awarded to the plaintiff and 75% of the award to be placed in a civil reparation trust fund to be administered by either this court or the state court administrator. They contend that this would constitute an excessive fine.

The relevant portion of Iowa Code § 668A.1(2) states:

2. An award for punitive or exemplary damages shall not be made unless the answer or finding pursuant to subsection 1, paragraph "a", is affirmative. If such answer or finding is affirmative, the jury, or court if there is no jury, shall fix the amount of punitive or exemplary damages to be awarded, and such damages shall be ordered paid as follows:

a. If the answer or finding pursuant to subsection 1, paragraph "b", is affirmative, the full amount of the punitive or exemplary damages awarded shall be paid to the claimant.

b. If the answer or finding pursuant to subsection 1, paragraph "b", is negative, after payment of all applicable costs and fees, an amount not to exceed twenty-five percent of the punitive or exemplary damages awarded may be ordered paid to the claimant, with the remainder of the award to be ordered paid into a civil reparations trust fund administered by the state court administrator. Funds placed in the civil reparations trust shall be under the control and supervision of the executive council, and shall be disbursed only for purposes of indigent civil litigation programs or insurance assistance programs.

In support of its argument Deere cites *McBride v. General Motors Corp.*, 737 F.Supp. 1563, 1577–78 (M.D.Ga.1990). In *McBride*, the court found that the product liability punitive damage award section of the Georgia Tort Reform Act of 1987, violated the Excessive Fines Clause of the United States Constitution.

The Georgia punitive damage section in question, in pertinent part, stated:

51–12–5.1. Punitive damages.

(e)(1) In a tort case in which the cause of action arises from product liability, there shall be no limitation regarding the amount which may be awarded as punitive damages....

(2) Seventy-five percent of any amounts awarded under this subsection as punitive damages, less a proportionate part of the costs of litigation, including reasonable attorney's fees, all as determined by the trial judge, shall be paid into the treasury of the state through the Fiscal Division of the Department of Administrative Services. Upon issuance of judgment in such a case, the state shall have all rights due a judgment creditor until such judgment is satisfied and shall stand on equal footing with the plaintiff of the original case in securing a recovery after payment to the plaintiff of damages awarded other than as punitive damages....

This is clearly not the situation in Iowa. Iowa Code § 668A.1 does not provide the State of Iowa with any interest in the punitive damage award. A clear distinction can be made between funds that are to be placed into the state treasury and those funds that are to be placed into a civil reparations trust fund to be administered by the courts. *See generally, Browning–Ferris Industries v. Kelco Disposal, Inc.*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). Accordingly, this portion of the motion for judgment notwithstanding the verdict is denied.

(d) The double jeopardy and self-incrimination clauses of the Fifth Amendment to the United States Constitution and the double jeopardy clause of Article I, Section 12 of the Iowa Constitution;

Deere fails to put forward any meaningful argument in this area, and this court is unaware of any such compelling law under the circumstances we have before us. Accordingly, it is denied.

(e) The ex post facto clause of Article I, Section 10 of the United States Constitution and Article I, Section 21 of the Iowa Constitution.

Deere fails to address this argument in its brief and the court finds no rational basis for a discussion of this point. Accordingly it is denied.

(3) The court erred in submitting the issue of punitive damages to the jury when there was insufficient admissible evidence of any willful and wanton conduct by Deere.

■ As mentioned above, this is the second trial before this court involving this type of accident on this model of combine. In *Christopherson,* this court found sufficient evidence to submit punitive damages,[8] and in this matter additional evidence was presented to support the submission of punitive damages. For example, the sale of the 3,100 "pipeline" combines after the production line modification had been made as well as the failure to warn of the danger at the custom combining clinic[9] and in the letters sent to the dealers[10] and owners[11]. The court finds more than sufficient evidence was presented, and submission of the issue of punitive damages was clearly warranted by the evidence and because Deere delayed acting responsibly in order to save money. Accordingly, the issue in the motion for judgment notwithstanding the verdict is denied.

(4) The court erred in submitting the issue of failure to warn where the danger was open and obvious and plaintiff had actual knowledge of the danger, and in failing to direct a verdict on the basis that as a matter of law any lack of warnings was not the proximate cause of plaintiff's injury.

■ Deere argues that the danger of injury while cleaning grain residue out of the lower clean-out door on the vertical unloading auger was an open and obvious danger. In support of its argument, Deere states that any person who has worked around a farm knows that the insertion of a limb into a moving auger will result in bodily injury, and that as a matter of law this court should have directed a verdict for Deere on the issue of failure to warn.

As the undisputed facts show, approximately 22 farm workers had been injured on the Titan series combine around the clean-out door prior to the Burke accident, and 4 after. The standard for summary judgment is analogous to that for a directed verdict under Rule 50(a) of the Federal Rules of Civil Procedure. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). After hearing the testimony of the five live similarly injured witnesses, a question of material fact was clearly present on the question of whether or not this danger was open and obvious, and as such the motion for directed verdict was denied. Deere does not bring any additional law, or argument forward that was not argued and considered at the time of the argument on the directed verdict motion. Accordingly, this portion of the motion for judgment notwithstanding the verdict is denied.

(5) The court erred in failing to direct a verdict on strict liability for defective design for the reason that the product was not unreasonably dangerous as a matter of law, and that any unreasonably dangerous condition was not the proximate cause of plaintiff's injury.

■ The court found at the time of trial, and continues to so find, that there was a question of material fact as to whether or not the unloading auger was unreasonably dangerous under a balancing process which compares the utility of a product on one side and the risk of its use on the other. *See Fell v. Kewanee Farm Equipment Co.,* 457 N.W.2d 911, 918 (Iowa 1990). A directed verdict on strict liability for defective design was not appropriate. In addition the court also found, and continues to find, that a finding of proximate cause also required a determination of a

---

**8.** The jury did not award any punitive damages.

**9.** Exhibit 25.

**10.** Exhibit 6A.

**11.** Exhibit 6B.

material fact, which would preclude the sustaining of a motion for a directed verdict. Accordingly, this two-pronged issue in support of the motion for judgment notwithstanding the verdict is denied.

(6) The court erred in permitting the jury to impose liability on Deere for post-sale conduct concerning warnings and product modification programs in the absence of any legal duty to recall or modify products previously sold.

■ Deere argues that the court committed error by allowing evidence to be interjected into this trial, which had as its focus Deere's post-sale conduct concerning warnings and product modification programs in light of the absence of any duty to recall products previously sold.

In support of its argument, Deere cites *Hale v. Firestone Tire & Rubber Company*, 820 F.2d 928 (8th Cir.1987); *Mulligan v. Lederle Lab.*, 786 F.2d 859 (8th Cir.1986); *Ferren v. Richards Mfg. Co.*, 733 F.2d 526 (8th Cir.1984); *Parks v. City of Marshalltown*, 440 N.W.2d 377 (Iowa 1989); *Ryan v. Arneson*, 422 N.W.2d 491 (Iowa 1988); *Schneider v. Middleswart*, 457 N.W.2d 33 (Iowa App.1990); and *Ettus v. Orkin Exterminating Co., Inc.*, 233 Kan. 555, 665 P.2d 730 (1983).

After a thorough review of the above listed cases, the court finds that either these cases cannot be stretched as far as Deere would like them to stretch, or they are clearly distinguishable on other grounds. *Hale, Ferren,* and *Mulligan,* are all products liability cases arising out of the Eighth Circuit; however, they come out of states other than Iowa, with different laws, and can hardly be controlling. In addition *Hale* and *Ferren* hold that post-sale conduct cannot form the sole basis for punitive damages. *Mulligan* held that all post-sale conduct need not be excluded. Rather, it holds that post-sale knowledge alone may not form the basis of a punitive damage award, but the jury might consider post-sale conduct to determine conscious indifference to the consequences of its previous actions. Deere's next case, *Parks,* is not a products liability case. The Iowa Supreme Court held in *Parks* that tortious

conduct after a breach of contract will not form the basis of recovery of punitive damages for breach of contract. The next two cases, *Ryan* and *Schneider,* are Iowa cases that address the excessiveness of punitive damages and not the evidence which proves the damages. The final case, *Ettus,* is a case out of the Supreme Court of Kansas involving claims of fraud and negligence. After review of this case, the court finds the following passage to be related to the case at hand. The Kansas Supreme Court cited with favor 25A C.J.S, *Damages* § 159 at page 68, wherein it stated:

Evidence of other acts of the defendant, either preceding or following the particular acts alleged and for which damages are sought, is admissible if so connected with the particular acts as tending to show defendant's disposition, intention, or motive in the commission of the particular acts for which damages are claimed.

In response, the plaintiff argues that Iowa Code § 668.12 recognizes a continuing duty to warn in Iowa. That section states:

Liability for products-state of the art defense.

In any action brought pursuant to this chapter against an assembler, designer, supplier of specifications, distributor, manufacture or seller for damages arising from an alleged defect in the design, testing, manufacturing, formulation, packaging, warning, or labeling of a product, a percentage of fault shall not be assigned to such persons if they plead and prove that the product conformed to the state of the art in existence at the time the product was designed, tested, manufactured, formulated, packaged, provided with a warning, or labeled. *Nothing contained in this section shall diminish the duty of an assembler, designer, supplier of specifications, distributor, manufacture or seller to warn concerning subsequently acquired knowledge of a defect or dangerous condition that would render the product unreasonably dangerous for its foresee-*

*able use or diminish the liability for failure to so warn.*

(Emphasis added.)

During the trial the court was apprised that the *Restatement (Second) of Torts* § 388 places a duty upon a manufacturer of product to warn subsequent users of a known danger. Section 388 was adopted by the Iowa Supreme Court in *West v. Broderick & Bascom Rope Company,* 197 N.W.2d 202, 209 (Iowa 1972). Section 388 of the Restatement (Second) of Torts states:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> > (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
> >
> > (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
> >
> > (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

The *West,* court stated further that § 394 makes § 388 applicable to manufacturers and elaborated on the extent of the notice that must be given when they stated:

> How far down the distributive chain a manufacturer must warn is determined by the general requirement of reasonable care. As stated in Restatement, Torts 2d § 388, Comment n, "Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It merely a means by which this information is to be conveyed to those who are to use the chattel. *The question remains whether this method gives a reasonable*

*assurance that the information will reach those whose safety depends upon their having it.*" See also Noel, Products Defective Because of Inadequate Directions or Warnings, 23 Southwestern L.J. 256, 281 ("the warning must be reasonably calculated to reach such persons [ultimate users], directly or indirectly").

Whether reasonable care requires warning beyond the manufacturer's immediate vendee in a particular case depends upon various factors. See Comment n, supra. Among them are the likelihood or unlikelihood that harm will occur if the vendee does not pass on the warning to the ultimate user, the trivial or substantial nature of the probability that the particular vendee will pass on the warning, and the ease or burden of the giving of warning, by the manufacturer to the ultimate user. As stated in Comment n regarding disclosure to the user of the properties of products, "Where the danger involved in the ignorant use of their true quality is great and such means of disclosure are practicable and not unduly burdensome, it may well be that the supplier should be required to adopt them." *Id.* at 211.

When ruling on the admissibility of this evidence relating to Deere's post-sale conduct to this plaintiff, this court stated that this evidence was not being offered or admitted for the purpose of imposing a duty of recall on Deere, or involved any finding of agency. The admission of this evidence was allowed as a response to the Deere's "we are as white as the driven snow" or "if our head was empty our heart was pure" type of argument. The court at the time of ruling on the admissibility had been apprised of the theme being developed by Deere. Deere argued that through its safety committee, it had taken every possible course of action including the issuance of the warning decal and the 99% completion rate[12] on the field modification of unloading auger.

The Eighth Circuit Court of Appeals in *Kehm v. Proctor & Gamble Mfg. Co.,* 724

12. Exhibit #4 page 23.

F.2d 613, 622 (8th Cir.1983), held evidence of a product manufacturer's post-sale conduct relevant for impeachment purposes. The *Kehm* court stated:

> Proctor & Gamble introduced evidence of the Rely market withdraw to show the company's good faith towards the consuming public. It attempted to portray the withdrawal as wholly voluntary on its part. In fact, in Proctor & Gamble's counsel's opening statement, he stated: "When these statistics came in and continued to come in ... this company, because of its years of honesty and concern for the consumer, elected to remove this product from the market until this problem could be isolated and resolved, unlike any of its competitors ... so as you can see, there is no evidence ... that Proctor & Gamble has done anything but acted admirably under these circumstances."
>
> The Kehms, on the other hand, attempted to show that Proctor & Gamble withdrew Rely only after the Food and Drug Administration advised it that a soon-to-be-released CDC[13] study showed a high correlation between Rely and TSS[14] than between other tampons and TSS, and after the FDA[15] recommended that Proctor & Gamble remove Rely from the market and notify users of the risks. The Kehms also introduced evidence to show that before it withdraw the product, Proctor & Gamble requested that the CDC not mention Rely by name in the forthcoming study. Finally, the Kehms introduced evidence that Proctor & Gamble had entered into a consent agreement with the FDA, in which it promised to withdraw Rely and inform consumers of the recent CDC study results.
>
> Whether Proctor & Gamble withdrew Rely voluntarily was hotly contested by the parties. At least four times during the trial, Proctor & Gamble called attention to the voluntary nature of its withdrawal. Evidence relating to the withdrawal was admissible for purposes of impeachment, and perhaps also to show the existence or nonexistence of a duty to withdraw the product. Clearly, then, Proctor & Gamble was not entitled to an instruction that the jury consider the evidence for no purpose other than as an illustration of the case's "background".
>
> Most importantly, given the substantial amounts of time and testimony devoted at trial to the circumstances surrounding Rely's market withdrawal, the likelihood that a limiting instruction would have lessened the possibility of prejudice, or that the absence of such an instruction would have generated prejudice, is very small. Indeed, a limiting instruction may well have served only to confuse the issues. The withdrawal of Rely from the market is inextricably bound up with Proctor & Gamble's credibility and its portrait of itself as a corporation concerned for the public's welfare. It would only obscure the issues to instruct the jury to regard the facts of withdrawal as mere "background," when Proctor & Gamble itself made the voluntariness of the withdrawal a part of its attempt to show that it acted reasonably during the TSS crisis.

*Id.* at 622 (footnotes added).

With *West, Kehm,* Iowa Code § 668.12, and Restatement (Second) of Torts § 388, the court found that in the interest of a fair trial, Deere's post-sale conduct was relevant for impeachment purposes and the probative value outweighed any prejudicial effect. In making this ruling, the court, as mentioned earlier, also had the benefit of having had tried, just one year earlier, the *Christopherson* case, as well as the opportunity of reviewing *Wheeler v. John Deere Co.,* 862 F.2d 1404 (10th Cir.1988) (*Wheeler I*). At the time of the ruling, the court was satisfied with the procedural safeguards in place in order to protect Deere's interests. Deere was afforded every opportunity to cross-examine Mr. Jack James,

---

**13.** CDC is an abbreviation for Center for Disease Control.

**14.** TSS is an abbreviation for toxic shock syndrome.

**15.** FDA is an abbreviation for the Food and Drug Administration.

the plaintiff's primary witness, in this area of the evidence. In fact, the court allowed for Mr. James' deposition to be taken while the trial was proceeding. The court was aware that Deere's expert witness had actually gone to inspect one of the combines that plaintiff claimed was being offered for sale on a Deere-authorized dealers' lot. Not only was Deere afforded every opportunity to "test" the credibility of this evidence, it still had its case in chief to put on evidence to rebut or rehabilitate its credibility. It is important to keep in mind that this type of injury, on this series of combine, had been litigated at least five times [16] prior to this trial by the same plaintiff's counsel and Deere's in-house counsel. Each side knew the evidence in this case inside and out.

In support of its failure-to-warn theory, plaintiff was successful in entering into evidence exhibits of letters Deere had sent to its dealers [17] and combine owners [18]. These letters contained different levels of information of the risk of injury from this combine. Plaintiff, prior to calling its first witness, also read to the jury a list of admissions made by Deere. Deere in response to request for admissions numbers 14 and 15 admitted that in March 1981, it held a clinic for custom combiners in Wichita, Kansas.[19] Deere also admitted that it did not inform any of the clinic's participants of the potential for injury at the lower clean-out door or of any of the accidents it knew about at that time. This was a particularly important piece of evidence as part of the agenda at the clinic dealt with machine productivity, parts and service of the combine.[20] Plaintiff also was successful in the admission of a memo from one of Deere's dealers inquiring "should we be considering a modification on these older combines to close up the opening (as it is on the newer machines) before this kind of accident happens again?".[21]

It was in response to evidence along these lines that Deere argued that it had undertaken every reasonable step to remedy this situation. Deere argued the success of their H104 decal program, and the success of the H401 retrofit program. The evidence the court admitted was for the limited purpose of attempting to rebut this argument. Accordingly, this point in the motion for judgment notwithstanding the verdict is denied.

(7) Even if a duty to make post-sale modifications were found, notification of the owner and dealer of the modification program and providing the dealer with the parts necessary for modification fulfilled any duty to recall or make post-sale modifications as a matter of law.

■ In light of *Fell*, this court believes that if faced with a similar question, the Iowa Supreme Court would adopt a holding similar to that position adopted in *Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d 1311, 1319 (7th Cir.1983), where the court stated:

The law as to precisely what information must be provided by the manufacturer has been evolving; and most recently, courts have been employing a flexible case-by-case approach in evaluating the adequacy of a particular warning. The Wisconsin Supreme Court in *Schuh v. Fox River Tractor Co.*, 63 Wis.2d 728, 218 N.W.2d 279 (1974), in making such an evaluation, first observed that the adequacy of a warning is an issue for the jury. The court went on to set forth the elements of an adequate warning: "[V]arious general criteria against when a warning is to be measured to determine

---

16. *Wheeler v. John Deere Co.*, 862 F.2d 1404 (10th Cir.1988). (*Wheeler I*).
 *Wheeler v. John Deere Co.*, 935 F.2d 1090 (10th Cir.1991). (*Wheeler II*).
 *Christopherson v. Deere & Co.*, 941 F.2d 692 (8th Cir.1991).
 *Melton v. Deere & Co.*, 887 F.2d 1241 (5th Cir.1989).
 *Lockley v. Deere & Co.*, 933 F.2d 1378 (8th Cir.1991).

17. Exhibit 6A.

18. Exhibit 6B.

19. (Tr. at 169–70).

20. Exhibit 25.

21. Exhibit 23.

its adequacy have been stated by the courts. Thus, it has been said that a seller must give the purchaser of a dangerous article a warning that is accurate, strong, and clear, and readily noticeable.

Any ambiguity in the language of a warning furnished in connection with the sale of a chattel is to be 'construed against the one who chose the words used.'

The warning must be appropriate; implicit in the duty to warn is the duty to warn with the degree of intensity that would cause a reasonable man to exercise for his safety the caution commensurate with the potential danger. From this it follows that the likelihood of an accident's taking place and the seriousness of the consequences are always pertinent matters to be considered with respect to the duty to provide a sufficient warning label, and that there is a particular need for a sufficient warning where there is a representation that the product in question is not dangerous."

Accordingly, this point on the motion for judgment notwithstanding the verdict is denied.

(8) The court erred in permitting live and deposition testimony of other injured persons and owners.

 Evidence of accidents similar in nature are admissable in strict liability actions. The Iowa Court of Appeals in *Sandry v. John Deere Company*, 452 N.W.2d 616, 618 (Iowa App.1989), stated:

Evidence of other accidents is admissible in a strict liability action on a showing the other accidents were substantially similar to the one being tried. *Eickelberg v. Deere & Co.*, 276 N.W.2d 442, 445 (Iowa 1979). It is within the trial court's sound judicial discretion to determine whether the other accidents are substantially similar. *Id.*

The question before the trial court is one of relevancy; is the evidence relevant and does its probative value outweigh the danger of prejudice. *Id.* The probative value is measured by the likelihood the same condition caused the acci-

dent in the instant litigation. *Cook v. State*, 431 N.W.2d 800, 803 (Iowa 1988).

The Iowa Court of Appeals in *Rattenborg v. Montgomery Elevator Co.*, 438 N.W.2d 602, 606 (Iowa App.1989) further stated:

Evidence of subsequent accidents may be considered pertinent in determining whether or not the product was hazardous. *See Ginnis v. Mapes Hotel Corporation*, 86 Nev. 408, 470 P.2d 135, 139 (1970).

Exactly identical circumstances cannot be realized and are not required. *See Jones & Laughlin Steel Corp. v. Matherne*, 348 F.2d 394, 400–01 (5th Cir.1965). Where defendant has ample opportunity to show differences by cross-examination or by its own witnesses, the differences may go to the weight rather than the admissibility of the evidence. *Id.*

The Iowa [Supreme] Court has also recognized the admissibility of evidence of the absence of accidents at the same place or with the same instrumentality under substantially similar circumstances as probative of the absence of danger or lack of knowledge of the danger by the defending party. *See Schuller v. Hy–Vee Food Stores*, 328 N.W.2d 328, 330 (Iowa 1982).

The following excerpts from the trial transcript point out the discussion held in chambers before opening statements.

Tr. p. 80, line 24—p. 81, line 15:

COURT: I've heard you out, and I have a little trepidation about this, but I'm not going to—you're going to get five and you're going to get to tell about five more, just like the last time. I gave a lot of thought to it last time, and I'm not going to change the ruling that I made last time. And I'm not going to name who they are, and you can have any five you want. And your record is made. You've made a good one. But we're going to do the same way we did last time. If I made a mistake there, why, we'll have to try it over again. But I believe it's in line with what Judge Kelly has done and probably less—it's more restrictive on

the plaintiff than what Judge Kelly did.

As far as my own thoughts, I would think it might be safer to—for me to rule that you can only have guys with arms come on, but my point is that safer is not the test. Safer for me that I don't get reversed, yes. Safer for a fair trial, I am not persuaded. So that's the way it's going to be.

Tr. p. 82, lines 16–19:

COURT: You can't—in your opening statement you can't talk about any more than several. Just say there's been several others, no numbers, no 22 before, no nothing, just several others. Anything else?

Tr. p. 83, lines 1–8:

MR. WILSON: In view of the court's ruling then, we'll go ahead and mention the whole 27. We feel we have to then.

COURT: In opening statement?

MR. WILSON: In opening statement yes. We know the court is going to let in ten, and we feel that to present our case, then we would have to go into the whole 27.

It can be seen from the above transcript excerpts the court was only going to allow five live witnesses and tell the jury that if given the chance the plaintiff would have five more similarly injured that would testify in the same manner. Counsel for Deere had offered to stipulate to the similarity of the accidents in order to avoid live testimony. That offer was rejected by plaintiff's counsel.

Throughout the trial counsel for Deere raised countless Rule 403 objections. Each and every time a piece of evidence which could even remotely be considered unfavorable toward Deere was offered, a 403 objection was raised. This court views all substantive evidence as prejudicial against some party. The question before a trial judge on a Rule 403 objection is whether the probative value is outweighed by the prejudicial effect of the evidence sought.

A trial judge has broad discretion regarding the admissibility of evidence, and a determination that the probative value of certain evidence outweighs any potential unfair prejudice is also a matter within the discretion of the trial judge. *Smith v. Firestone Tire & Rubber Co.*, 755 F.2d 129, 134 (8th Cir.1985). Rule 403 is an extraordinary remedy to be used sparingly to exclude relevant evidence where the danger exists that its probative value is substantially outweighed by the danger of unfair prejudice. *United States v. Plotke*, 725 F.2d 1303 (11th Cir.1984).

The court at that time, as it is now, was unwilling to force counsel's stipulation upon the plaintiff. Any perceived prejudice to Deere by inflammatory and prejudicial testimony was predominantly of its own making, by telling the jury in its opening statement about 22 similarly injured,[22] when the court had already announced to counsel that it was going to limit the number to 10. In other words, the court concluded that allowing the jury to hear live testimony from five of the similarly injured, and to be told of five more, was not unduly prejudicial, as the probative value outweighed the prejudicial effect. In a products liability case, admission of evidence of other lawsuits against defendant was not reversible error. *Soden v. Freightliner Corp.*, 714 F.2d 498, 508–10 (5th Cir.1983). Counsel for Deere, by informing the jury of 22 similarly injured, in this court's opinion, changed what was a fair number of similarly injured (ten), and enlarged it to 22 and now wants to say it was prejudiced. This action was taken as a matter of trial strategy and Deere cannot now reasonably expect the court to take this alleged point of error seriously. Accordingly, it is denied.

(9) The verdict was against the weight of the evidence.

██ Throughout this trial Deere chose not to have a corporate representative present in the courtroom. This is its prerogative and is clearly allowed under the rules. Deere called only one witness in its case, an expert witness, Dr. Bobby Clarey.

---

**22.** 22 were injured prior to this plaintiff's injury.

It is clear from the verdict that the jury found Dr. Clarey's testimony to be either impeached or not as credible as plaintiff's expert witness. The plaintiff had presented several knowledgeable witnesses and had read pertinent portions of depositions of Deere design engineers. These witnesses testified about the design and testing history of the Titan series combine, and made some statements and/or admissions that were helpful to the plaintiff. It is not hard to surmise in hindsight that the jury wanted to hear *someone* from Deere testify that if not all, some of the evil acts alleged by the plaintiff were not true, or to provide a more favorable view of the evidence. The jury was left to look for some credible defense on the part of Deere. This did not happen. Without further evidence, beyond that of its expert witness, Deere gave the jury only one option. Either you believe our expert witness or we have no defense.

Additional support for a finding that the verdict was supported by the evidence can be found in a review of excerpts of the trial transcript. Mr. Hitzhusen was a design engineer for Deere during the development of the Titan series combine. Plaintiff called him by a former statement under oath.

Tr. p. 636, line 15—p. 637, line 6.

Q Have you ever performed maintenance on a combine with the engine running?

A Yes. With the engine running, yes.

Q It's true, isn't it, there are certain maintenance functions that have to be—certain maintenance items that have to be done on a combine that require, during some period in that maintenance, that the engine be running?

A Yes, there are some service functions that are performed with the engine operating.

Q Does (sic) you, in any of the times that you performed this clean-out maintenance on a Model 20 combine with the original clean-out door config-uration—did you ever at any time in those instances ever place your hand inside the lower clean-out door while the engine was running but the auger was not engaged?

A Yes, I believe I did.

Q For what purpose?

A To clean grain from the lower sump.[23]

The following excerpt is from the testimony of John Sevart, plaintiff's expert witness.

P. 1111, line 19—P. 1114, line 21.

Q And tell us, please, did you consider whether the time of the H401 program was of any significance from an engineering standpoint in giving your opinions about these—that you've given about Deere's engineering decisions?

A Yes.

Q And tell the jury what is it about the timing that you considered in giving your opinions?

A Two-year lag between the time that the change was implemented on a production basis versus the time it was done on a retrofit. And given the magnitude of the risk, there was a seriousness of the injuries that was being reported that was an excessive lag time. No way to change 39,000 machines in one day, but it should not take two years to even start.

Q Well, weren't you in the courtroom when Wayne Slavens[24] said it was necessary to test, test and test and test?

A Yes, I heard that read.

Q Did you agree with that?

A No.

Q Why not?

A Changes were very, very minor. And in terms of the design—it was well executed design into—to permit the function of the machine.

Q Which design?

A The new design.

Q All right.

---

23. This is exactly what caused injury in the 26 similarly injured situations.

24. Wayne Slavens was a design engineer for Deere who worked on the Titan series combine.

A And further, there shouldn't have been any more testing required on the retrofit than there was for the new models. And the new models went out two years sooner with the revised design. So if two years of testing was required it should have been required for everything, not just for the modification.

Q Well, didn't you hear Mr. Slavens' testimony about parts—getting parts and everything had to be—to get ready, did you hear that?

A Yes.

Q Did you agree with that?

A Well, I agree with it; I just don't agree it should take two years.

Q Well, in this instance, why not?

A The parts are not that complex of part. And more importantly, those parts are already being produced for the production—for production runs; the sump and door being produced, the warnings being produced. So simply a matter of producing some percentage above the production run.

The little plate that is—that has to be welded on that is not a part of the new design on the production line is a very simple part that can be built in one operation, one stamping operation to form the part. Just not complex. It is not the type of thing it takes two years to tool up for when it's already being produced on the assembly line.

Q Wait a minute. In June of 1982 when they had this new design on—on the line, quit making the old bad design, didn't they have—didn't they order up housing parts for the new design?

A Yes.

Q Couldn't they order up 37,000 more if they'd seen fit?

A New housings?

Q Yeah, if they wanted to?

A They could have, yes.

Q They knew they had 37,000 out there in the bad design, didn't they?

A Yes.

Q And this had smaller door to fit the smaller opening, didn't they have that on the production line in June of '82?

A The door they did, yes.

Q They could have ordered that many more doors if they wanted to?

A Those—the only thing that was not production was the patch. The patch was not a production item.

Q Well, the patch—was it necessary if they already had the—they—could they have used the new housings on old machine instead of patch if they'd seen fit to, from an engineering standpoint I'm talking about?

A They could have. I wouldn't have recommended it. I think the labor required to make that kind of change is more than what they did. The patch is the right way to go, Mr. Sellers.

Q Well, you're talking about dollars, or are you talking about hands?

A Well, I'm talking about dollars.

In addition, plaintiff sought, and was granted, admission of exhibit 29(e). This exhibit is a memo dated 14 August 1981 addressed to D.C. Bichel, a Deere design engineer, from a W.J. Borchardt, then chairman of the safety committee. The subject of the memo was the unloading auger clean-out area on the Titan series combine. The memo stated:

This machine is equipped with your experimental vertical unloading auger with clean out door on the front side and small opening on the rear side.

I removed these doors and cleaned out this area to evaluate the function and safety implications. There was no problem in cleaning the area thoroughly reaching through the front door and either pulling material forward or pushing it through the small rear opening. No other functional or durability problems have been observed with this arrangement.

I did note that it seemed natural to reach through the rear opening with your fingers to get final clean out. On this particular machine there was barely clearance between the bottom of the auger flight and the end of the housing so

that if the auger did turn there would be a good chance your finger would be cut off at the end of the small door opening. This remote possibility can be eliminated by putting a 45 (degree) cut off on the tip of the flighting to eliminate this cut off point.

From this memo, the jury could determine that Deere was aware, at least in August 1981, a full three years and three months before plaintiff's injury, of the foreseeable possibility of insertion of fingers, hands, and arms into the unloading auger housing to clean out grain residue.

In preparation for the hearing on these motions, the court again read the order issued by Judge Kelly of the U.S. District Court for the district of Kansas, who has also held two trials in *Wheeler v. Deere*, No. 82–1790–K, 1990 WL 38586 (D.Kan. March 16, 1990). Our case involved the same issues, same plaintiff's counsel, same expert witness for the plaintiff, and in fact the same defense expert witness. In reading Judge Kelly's findings, a vivid memory of this trial was struck. On pages eight and nine Judge Kelly writes:

Last, but not least, there is another piece of evidence that the jury was fully acquainted with and which was overlooked by the defense in its motion for judgment notwithstanding the verdict. I'm not talking about plaintiff's expert, defendant's witnesses, plaintiff's testimony, or about the testimony of the 10 persons who testified here, all of which was entirely relevant and persuasive. I'm talking about defendant's demonstration to the jury of the combine in question, operating in a manner similar to its operation at the time of plaintiff's injury.

In this case, defendant, through its expert Dr. Clarey, demonstrated the combine in full operation and was at liberty to explain fully that operation.

With the litigants' consent, I permitted the jurors, through a temporary foreperson, to ask questions and fully familiarize themselves at the time of the demonstration. The questions asked by the foreperson were most trenchant and to the point. With my consent, the jury

explored the machine fully; in fact, they were all over it, collectively and individually. They simulated the setting which gave rise to the injuries of plaintiff, substituting themselves for the plaintiff, Fenton and Miller. It was an interesting event which, in this court's view, backfired on the defense. When the jury returned for further testimony, in my view it understood all the issues and defenses quite well. As of that point, the plaintiff's evidence, including the testimony of witness Sevart, made perfect sense. As discussed further in this opinion, it is fair to say at this point that when plaintiff's counsel finished his cross-examination of Dr. Clarey, the witness' thesis fell on deaf ears. To be sure, I am not the factfinder; the foregoing is only my perception of that day's occurrence. I can only say that it was perfectly clear to me that the plaintiff's case was made and he could likely win.

This is quite similar to what happened in this trial. The court allowed a jury view of the combine, and the jurors asked many poignant and probing questions. The jurors climbed up into the cab of the combine. They stood in front of the vertical unloading auger clean-out door, just as the plaintiff did the day of his injury, and checked to see if anyone was in the cab of the combine. They then performed this task in reverse. They asked that the trashing mechanism be turned on. They inquired about the various decals. Overall, this jury demonstrated to all who were present that they were "in step with the evidence", that they had a full understanding of the issues, and demonstrated that some had an adequate background as to farm machinery.

Looking at the evidence as a whole, the court finds that the verdict was supported by the evidence. Accordingly, this part of the motion for judgment notwithstanding the verdict is denied.

## II. *Motion for New Trial.*

(1) The judgment for punitive damages is grossly excessive, unconscionable and

shocks the conscience, and is a result of passion and prejudice.

This point of alleged error has been discussed on pages 1237–38 of this order, and is denied for the same reasons. Accordingly, this portion of the motion for new trial is denied, provided that the plaintiff agrees to except a remittitur of the punitive damage award to $28,000,000; otherwise, a new trial will be awarded on the limited issue of determining punitive damages.

(2) The judgment for punitive damages violates the following clauses of the Constitution of the United States: the Fifth, Eighth and Fourteenth Amendments, and the Constitution of the State of Iowa:

(a) The due process clauses of the Fifth and Fourteenth Amendments;

(b) The equal protection clause of the Fourteenth Amendment to the United States Constitution;

(c) The excessive fines and cruel and unusual punishment clauses of the Eighth Amendment to the United States Constitution and Article I, Section 17 of the Iowa Constitution;

(d) The double jeopardy and self-incrimination clauses of the Fifth Amendment to the United States Constitution and the double jeopardy clause of Article I, Section 12 of the Iowa Constitution;

(e) The ex post facto clause of Article I, Section 10 of the United States Constitution and Article I, Section 21 of the Iowa Constitution.

This point of alleged error has been discussed on pages 1238–43 of this order, and is denied for the same reasons. Accordingly, this portion of the motion for new trial is denied.

(3) The court erred in submitting the issue of punitive damages to the jury when there was insufficient admissible evidence of any willful and wanton conduct by Deere.

This point of alleged error has been discussed on pages 1242–43 of this order, and is denied for the same reasons. According-

ly, this portion of the motion for new trial is denied.

(4) The court's Jury Instructions Nos. 34–36 and verdict form on punitive damages are in error based on the following grounds:

(a) The instructions failed to properly instruct on the required standard of proof;

At the time of the filing of this action, the Iowa Code section that addressed punitive damages was § 668A.1. This section states:

Punitive or exemplary damages.

1. In a trial of a claim involving the request for punitive or exemplary damages, the court shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings, indicating all of the following:

a. Whether the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another.

b. Whether the conduct of the defendant was directed specifically at the claimant, or at the person from which the claimant's claim is derived.

2. An award for punitive or exemplary damages shall not be made unless the answer or finding pursuant to subsection 1, paragraph "a", is affirmative. If such answer or finding is affirmative, the jury, or court if there is no jury, shall fix the amount of punitive or exemplary damages to be awarded, and such damages shall be ordered paid as follows:

a. If the answer or finding pursuant to subsection 1, paragraph "b", is affirmative, the full amount of the punitive or exemplary damages awarded shall be paid to the claimant.

b. If the answer of finding pursuant to subsection 1, paragraph "b", is negative, after payment of all applicable costs and fees, an amount not to exceed twenty-five percent of the punitive or exemplary damages awarded may be ordered paid to the claimant, with the remainder of the award to be ordered paid into a civil reparations trust fund administered by the state court administrator. Funds

placed in the civil reparations trust shall be under the control and supervision of the executive council, and shall be disbursed only for purposes of indigent civil litigation programs or insurance assistance programs.

3. The mere allegation or assertion of a claim for punitive damages shall not form the basis for discovery of the wealth or ability to respond in damages on behalf of the party from whom punitive damages are claimed until such time as the claimant has established that sufficient admissible evidence exists to support a prima facie case establishing the requirements of subsection 1, paragraph "a".

A note following the statute states that this statute is applicable to cases filed on or after July 1, 1986.

In 1987 the Iowa legislature amended subsection 1, paragraph "a", to read as follows:

a. Whether, by a preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another.

A note following the statute states that the "1987 amendment to subsection 1, paragraph a, applies to all causes of action accruing on or after July 1, 1987; and those accruing before July 1, 1987, which are filed on or after September 15, 1987."

As noted, the only difference between the statute as enacted in 1986 and the 1987 amendment is the insertion of the language indicating a heightened burden of proof. As this matter was filed in 1986, the earlier and lower standard of proof is applicable.

Accordingly, this portion of the motion for new trial is denied.

(b) The instructions failed to adequately instruct that the jury may, but need not, award punitive damages;

■ A careful reading of Instruction No. 34[25] reveals that the jury was instruct-

ed that they "may" award punitive damages; it does not read that they must. The court's Instruction No. 34 adequately informs the jury that they may award punitive damages if the evidence supports it. The instruction states as follows:

Punitive damages *may* be awarded if the plaintiff has proven by a preponderance of the evidence the defendant Deere's conduct constituted a willful and wanton disregard for the rights or safety of another and caused actual damage to the plaintiff.

Punitive damages are not intended to compensate for injury but are allowed to punish and discourage the defendant Deere and others' like conduct in the future.

There is no exact rule to determine the amount of punitive damages, if any, you should award. In fixing the amount of punitive damages, you may consider all the evidence including:

1. The nature of defendant's conduct.

2. The amount of punitive damages which will punish and discourage like conduct by the defendant in view of its financial condition.

3. The plaintiff's actual damages. (emphasis added).

Accordingly, this portion of the motion for new trial is denied.

(c) The instructions omit the requirement that the amount of punitive damages awarded must bear a reasonable relationship to plaintiff's compensatory damages;

■ In support of its argument, Deere cites *Schneider v. Middleswart*, 457 N.W.2d 33, 35 (Iowa App.1990). A careful reading of *Schneider* does not support Deere's argument. In *Schneider*, the Iowa Court of Appeals did state that punitive damages must be reasonably related to actual damages; however, this discussion in *Schneider* was in the context of a court reviewing a punitive damage award. It is important to note that the *Schneider* court

---

**25.** Instruction No. 34 is Iowa Civil Jury Instruction 210.1 except for the change in the burden of proof as discussed above.

held: "In ascertaining whether a punitive damage award is excessive, we consider whether the award bears reasonable relation to the malevolent actions of the defendant which resulted in injury to the plaintiff." *Id.* at 35.

In *Ryan v. Arneson*, 422 N.W.2d 491, 494 (Iowa 1988) the court stated:

We have stated that punitive damages must be reasonably related to actual damages. *See McCarthy* [*v. J.P. Cullen & Son Corp.*], 199 N.W.2d [362] at 369–70 [Iowa 1972]. Recent cases, however, have held that punitive damages may be awarded even if actual damages were shown but never awarded. *See Westway Trading Corp. v. River Terminal Corp.*, 314 N.W.2d 398, 404 (Iowa 1982); *Pringle Tax Service* [*Inc. v. Knoblauch*], 282 N.W.2d [151] at 153–54 [Iowa 1979]. These cases show that our primary focus in review of a punitive damage award is the relationship between the punitive damage award and the wrongful conduct of the offending party.

The court finds Deere's argument misplaced. The time for consideration of the relationship between punitive damage awards and the actual damages is at the time of review by the trial court of the possibility of an excessive award. Consequently, if the primary focus of the trial court is not on a direct relationship between the punitive damage award and actual damages, it can hardly be an item of direct consideration by the jury. The court's Instruction No. 34 included the charge that the jury may consider all the evidence, including the plaintiff's actual damages. This portion of the instruction adequately informs the jury that the plaintiff's compensatory damages are to be taken into consideration. Under current law, nothing more is required. Accordingly, this portion of the motion for new trial is denied.

(d) The instructions fail to give the jury adequate guidance regarding the factors to be considered in determining the proper amount of punitive damages;

This point of alleged error has been discussed on pages 1238–40 of this order, and is denied for the same reasons. Accordingly, this portion of the motion for new trial is denied.

(e) The instructions failed to instruct the jury that they could not consider evidence of post-sale or post-accident conduct of Deere on the issue of punitive damages;

This point of alleged error has been discussed on pages 1243–47 of this order, and is denied for the same reasons. Accordingly, this portion of the motion for new trial is denied.

(f) Instruction No. 36 is inconsistent with Instruction No. 34, is one-sided, argumentative, and incorrectly states the applicable law in omitting reference to the requirement that the conduct must be willful and wanton, in referring to and failing to define "inherently dangerous."

■■■ Instruction No. 36 is taken from *Fell v. Kewanee Farm Equipment Co.*, 457 N.W.2d 911, 919 (Iowa 1990). *Fell* stated:

The legal basis for punitive damages is established in product liability cases where the manufacturer is shown to have knowledge that its product is inherently dangerous to persons or property and that its continued use is likely to cause injury or death, but nevertheless continues to market the product without making timely feasible modifications to eliminate the danger or make adequate disclosure and warning of such danger.

Instruction 35, the instruction immediately proceeding Instruction 36, defined willful and wanton for the jury. Instruction 35 stated:

"Willful" as used in Instruction No. 34 means "intentionally, deliberately, with bad or evil purpose, contrary to known duty."

"Wanton" as used in Instruction No. 34 requires an intentional act of an unreasonable character in disregard of the risk known to the actor or so obvious that the actor must be taken to have been aware of it and so great as to make

it highly probable that harm would follow.

The court finds no inconsistence between Instruction 34 (set out in full on page 1254 of this order) and Instruction 36. In addition, the court finds that Instruction 36 adequately states the law in Iowa. Accordingly, the portion of the motion for new trial is denied.

(g) The verdict form improperly advised the jury of the effect of its answer to Special Interrogatory No. 3 on punitive damages and incorrectly advised the jury if they answered "no" a portion of the punitive damages award would be paid into a civil trust fund administered by the court.

A district court has broad discretion to frame instructions and special interrogatories to the jury, as long as the entire charge fairly and adequately contains the law applicable to the case. *City of Malden, Mo. v. Union Elec. Co.*, 887 F.2d 157, 163 (8th Cir.1989).

The court inserted the complained-of portion of Special Interrogatory No. 3 in the interests of justice and a fair trial in light of the following in-chambers discussion: Tr. at 2424, lines 6–14.

MR. WILLSON: ... And we have argued in the brief that this is an improper comment to the jury because in the instructions you should only tell the jury what they need in order to resolve the issues.

THE COURT: If you promise you're not going to go out there and say don't make this guy rich with all these punitive damages like you won three lotteries or something. But you won't. You will argue that way.

MR. WILLSON: I will.

MR. JACK SELLERS: That's the problem.

Tr. P. 2425, line 6—P. 2426, line 17:

THE COURT: But aren't you getting a special extra plum you don't need if they—if the jury is down there thinking that all this dough would go to the plaintiff?

MR. JACK SELLERS: Judge, here's the problem. This is not just some idle language. This is a statement of substantive law, of public policy in Iowa because—and it's adopted because jurors are being asked to fix sums to punish and make an example, and they are entitled to know in what way, you know, in what way those special damages are going to be applied. And so it would be—we would fight for, your honor, to the death—

MR. WILLSON: Why don't—

MR. JACK SELLERS: That they be told that.

MR. WILLSON: The substantive law is not to help the jury determine the amount.

MR. JACK SELLERS: I think that the court, having looked at the objections that all of the defense lawyers have advanced to the Supreme Court of the United States and otherwise, and at the objections that have been made by Mr. Willson in the Christopherson case and adopted here, is that their objection is the undue enrichment of the plaintiff.

Counsel for the defendant, as set out above, insisted that the jury not be told of the Iowa law which directs that any amount awarded would not all go to the plaintiff. The court might have bought the argument if defense counsel would not have argued, "don't make this plaintiff a millionaire." Defense counsel would not agree to so refrain, as such, basic fairness would not allow such a scenario.

Accordingly, this portion of the motion for new trial is denied.

(5) The court erred in admitting post-sale and post-accident evidence of Deere's conduct on the issue of punitive damages when such evidence was not relevant to Deere's state of mind or motive at the time of the acts upon which liability to plaintiff is based.

As previously mentioned, the court did not allow evidence for Deere's post-sale and post-accident conduct to demonstrate Deere's state of mind. The post-sale and post-accident conduct was allowed for the sole purpose of impeachment of Deere's

"we are as white as the driven snow" argument. The jury is the sole judge of credibility and this post-sale conduct was highly relevant to this issue. Accordingly, this portion of the motion for new trial is denied.

(6) The court erred in permitting the jury to impose liability on Deere for post-sale conduct concerning warnings and product modification programs in the absence of any legal duty to recall or modify products previously sold.

This point of alleged error has been discussed on pages 1243–47 of this order, and is denied for the same reasons. Accordingly, this portion of the motion for new trial is denied.

(7) The court erred in failing to instruct on Deere's requested specifications of plaintiff's negligence, especially where the marshalling instruction told the jury these specifications were explained in other instructions, but were not, and in failing to instruct the jury on plaintiff's duty to exercise reasonable care for his own safety.

▮ Deere argues that the court failed to instruct on theories of plaintiff's negligence. In addition, Deere asserts that Instruction No. 26 failed to explain specifications set out in the marshalling instruction. A review of the Instructions proves that Deere's argument is unfounded. Instruction No. 26 [26] stated:

The defendant claims the plaintiff, Clair Burke, was at fault because of plaintiff's negligence:

1. Negligence in one or more of the following ways:

a. Putting his hand in the cleanout area at the time when Mark Goranson was engaging or had engaged the auger.

b. Failing to keep a lookout as to where Mark Goranson was.

c. Disregarding warnings.

d. Failing to communicate with the operator.

2. Voluntary and unreasonable assumption of the known danger.

These grounds of fault have been explained to you in other instructions.

Defendant must prove both of the following propositions:

1. The plaintiff, Clair Burke, was at fault in one or more of the claims set out above.

2. The fault was a proximate cause of plaintiff's damages.

If the defendant has failed to prove either of these propositions, the defendant has not proved its defense. If the defendant has proved both of these propositions, then you will assign a percentage of fault against the plaintiff and include plaintiff's fault in the total percentage of plaintiff's fault found by you in answering special verdicts.

Deere argues that other Instructions failed to explain "these grounds of fault" as promised in Instruction No. 26. The two grounds of fault list in Instruction No. 26 are negligence, and voluntary and unreasonable assumption of the known danger. The court defined negligence in Instruction No. 22 [27], where it stated:

"Negligence" means failure to use ordinary care. Ordinary care is the care which a reasonably careful person would use under similar circumstances. "Negligence" is doing something a reasonably careful person would not do under similar circumstances, or failing to do something a reasonable careful person would do under similar circumstances.

The court instructed the jury on the defense of "voluntary and unreasonable assumption of the known danger" in Instruction No. 19 [28] which stated:

The defendant claims the plaintiff, Clair Burke, voluntarily and unreasonably assumed the risk by putting his hand inside the cleanout (sump) area

---

**26.** Instruction No. 26 is a modified version of Iowa Civil Jury Instruction Number 400.6.

**27.** Instruction No. 22 is taken from Iowa Civil Jury Instruction 700.2.

**28.** Instruction No. 19 is taken from Iowa Civil Jury Instruction Number 1000.9.

with the motor on at a time when Mark Goranson was engaging, or had engaged, the auger without any communication between Clair and Mark. The plaintiff Burke has specifically denied this claim.

To prove this defense, the defendant must prove each of the following propositions:

1. The plaintiff knew the dangerous condition was present.

2. The plaintiff understood the nature of the danger to himself.

3. Nevertheless, the plaintiff freely, voluntarily, and unreasonably used the product.

4. The plaintiff's fault was a proximate cause of the plaintiff's damage.

Proximate cause has been defined for you in another instruction. A particular result may have more than one proximate cause. The defective product and plaintiff's misconduct may combine so that the fault of each is a proximate cause of an injury or damage. Concerning this defense, the fault of the plaintiff must be the proximate cause of his injury or damage, but it need not be the only proximate cause.

If the defendant fails to prove any of these propositions, the defendant has not proved this defense. If the defendant has proved all of these foregoing propositions, then you will include this fault in the total percentage of plaintiff's fault, if any, you find in accordance with the special verdict submitted with these instructions.

Deere further argues that the court failed to instruct the jury on the plaintiff's duty to exercise reasonable care for his own safety. Once again, review of the instructions reveals that this did not happen. In Instruction 29,[29] the court, building on Instruction No. 22, the negligence instruction, further instructed on the plaintiff's duty to exercise reasonable care for his own safety. Instruction No. 29 stated:

Because the amount of care exercised by a reasonably prudent person varies in proportion to the danger known to be involved in what is being done, it follows that the amount of caution required, in the use of ordinary care, will vary with the nature of what is being done, and all the surrounding circumstances shown by the evidence in the case. To put it another way any increase in foreseeable danger requires increased care.

The court, after a careful review of the instructions as a whole, is persuaded that the jury was properly instructed on Deere's theories of plaintiff's negligence and standard of care. The court in addition points out that the jury found, after considering the above set-out instructions, that it was sufficiently apprised of the defendant's claims so as to conclude that the plaintiff was 40% at fault for his injuries. This jury was fully instructed on all parties' theories. Accordingly, this issue in Deere's motion for new trial is denied.

(8) The court erred in permitting irrelevant and prejudicial evidence of post-accident conduct of independent dealerships, and permitting the jury to impose liability on Deere for acts or omissions of these dealerships in the absence of any proof of an agency relationship sufficient to establish vicarious liability and without any instruction as to what must be established to prove an agency relationship or vicarious liability for punitive conduct.

This point of alleged error has been discussed on pages 1243–47 of this order, and is denied for the same reasons. Accordingly, this portion of the motion for new trial is denied.

(9) The court erred in its instructions on key elements of plaintiff's sole theory of strict liability, specifically, the definition of unreasonably dangerous, the duty to warn, and the failure to instruct as to the effect of open and obvious dangers.

■ Deere argues that the court erred in submitting Instruction No. 13,[30] as it

---

**29.** Instruction No. 29 is taken from Devitt, Blackmar, and Wolff, *Federal Jury Practice and Instructions,* 4th Ed. Vol. 3 p. 138, Instruction No. 80.06.

**30.** Instruction No. 13 is Iowa Civil Jury Instruction No. 1000.4.

incorrectly states that the risk/utility test is an acceptable definition of unreasonably dangerous under Iowa law. Instruction No. 13 stated:

A defective product is unreasonably dangerous if:

1. The danger is greater than an ordinary consumer with knowledge of the product's characteristics would expect it to be.

2. The danger outweighs the utility of the product.

3. The benefits of the design do not outweigh the risks. In determining the issue, you may consider:

a. The seriousness of the harm posed by the design.

b. The likelihood that such danger would occur.

c. The mechanical feasibility of a safer alternate design.

d. The cost of an improved design.

e. The adverse consequences to the product and the user that would result from an alternate design.

f. Any other facts or circumstances shown by evidence having any bearing on the question.

In support of its position, Deere cites the recent *Report on Civil Jury Instructions* of the Iowa Defense Counsel Association Task Force (I.D.C.A.).[31] In its report, the I.D.C.A. argues that Iowa Civil Jury Instruction 1000.4 uses a risk/utility test instead of the traditionally applied consumer expectations test.

A quick review of the latest case out of the Iowa Supreme Court reveals its argument to be mostly unfounded. The Court in *Fell v. Kewanee Farm Equipment Co.*, 457 N.W.2d 911 (Iowa 1990), applies a hybrid of the consumer expectations test as well as a risk/utility test. This holding squares with Instruction No. 13. The *Fell* court stated at page 918:

A product is unreasonably dangerous [if] the product is dangerous and ... it was

unreasonable for such a danger to exist. Proof of unreasonableness involves a balancing process. On one side of the scale is the utility of the product and on the other is the risk of its use.

\* \* \* \* \* \*

In strict liability the plaintiff takes the design as it was finalized in the finished product and shows it was both dangerous and that it was unreasonable to subject the user to this danger because the user would not contemplate the danger in the normal and innocent·use of the product. *Aller v. Rodgers Machinery Mfg. Co.*, 268 N.W.2d 830, 835 (Iowa 1978). Such proof does not necessarily rest on direct evidence. A plaintiff may, and usually does, establish that a product is unreasonably dangerous by circumstantial evidence. Id. at 834.

*Fell v. Kewanee Farm Equipment Co.*, 457 N.W.2d 911, 918 (Iowa 1990).

The *Fell* court also cited with approval comments g and i to section 402A of the *Restatement (Second) of Torts* (1976), which states:

g. Defective condition. The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.

i. Unreasonably dangerous. The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food of drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini an as an instrument of torture. That is not what is meant by "unreasonably dangerous" in this Section. *The article sold must be dangerous to an extent beyond*

---

**31.** The I.D.C.A.'s complimentary copy of this report, sent to this court, was received in chambers in late December, 1990, some six weeks following the conclusion of this trial. Neither the report not its content were brought up by

the defendant at a time that it could have been considered by this court. Its contents, even post-trial, are not such that they should now be adopted by this court.

*that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.*

*Fell* at 916–17 (emphasis in original).

It is apparent that the Iowa Supreme Court looks to the risk/utility test for evidence of a product's unreasonably dangerous characteristics, and then applies the conclusion to consumer expectation test. Instruction No. 13 does just that. Accordingly, this point in the motion for judgment notwithstanding the verdict is denied.

(10) The court erred in submitting the issue of failure to warn where the danger was open and obvious and plaintiff had actual knowledge of the danger.

This point of alleged error has been discussed on page 1243 of this order, and is denied for the same reasons. Accordingly, this portion of the motion for new trial is denied.

(11) The court erred in permitting irrelevant, improper, and prejudicial lay opinion testimony.

 Deere argues that the court erred in allowing the similarly injured to testify that they and the operators of their combines were careful persons. Deere asserts that this testimony was self-serving and opinions of law that they were not negligent.

Federal Rule of Evidence 701 states:

If the witness is not testifying as an expert, the witness' testimony in the from of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact issue.

The court in exercising its discretion found the testimony of the similarly injured to fit well within the confines of Rule 701. Accordingly, this portion of the motion for new trial is denied.

(12) The court erred in permitting irrelevant, improper, and prejudicial expert opinion testimony, including testimony on matters which are not the proper subject of expert testimony.

 Deere argues that testimony of Mr. Sevart, plaintiff's engineering expert, and Dr. Stark, plaintiff's psychologist, was improper under Federal Rules of Evidence 702 and 704. Deere argues that questions such as the one found at Tr. pp. 1006–1008 were improper testimony for an expert witness. After building a proper foundation, plaintiff's counsel asked Mr. Sevart what his professional opinion was:

Tr. pp. 1007, line 16—P. 1009, line 15.
A. Be my (sic) professional opinion that the design was defective in such a manner as to render the product unreasonably dangerous when it was designed and manufactured.
Q. And tell us, please, did you in your study of the machine and in your studies and—and training and practice and teaching, did you—taking all that into consideration, did you form an opinion in your—after reviewing this—this design and machine that's in question in this case whether it was dangerous beyond the expectations of the ordinary user?
Mr. Willson: Same—excuse me.
A. Yes, I have an opinion.
Q. What is that opinion?
Mr. Willson: Same objection.
The Court: Same ruling. He may give his opinion.[32]
A. Yes, it would be my professional opinion that the danger would in fact exceed the expectations of the types of people who have to work about this machine for several engineering reasons.
Q. All right. Now then, sir, tell us, please, in words that the jury can understand, why you say this design on this part of the Titan series combine made and sold in 1978 and '79 was defective.
Mr. Willson: Same objection.
The Court: All right. You can have, if you like, Mr. Willson, a standing objec-

---

**32.** The court had earlier overruled Mr. Willson's objection that Mr. Sevart's testimony was not proper for expert opinion.

tion. However, you also have the right to object any time you want to.

Mr. Willson: I think it would be fine if I had a standing objection to these, Your Honor.

The Court: You have one. Yes, sir.

Mr. Willson: Thank you.

A. The design was defective in that it contained a long recognized hazard, namely, the rotating screw element of the auger which was known to represent a very serious risk on the part of design engineers. But design engineers also recognize that people who use this equipment did not appreciate the ways that this machinery could be inadvertently started, whether it was a combine or some other piece of machinery. They didn't realize how quickly—it's near instantaneous that the machine starts to rotate when power is applied. People work about this machinery do not have an appreciation for that. There was no system that would assist workers in developing that appreciation.

Now, from an engineering viewpoint, there were other reasons as well, and that is that there were alternative designs that wouldn't affect the utility of the machine. So that—the risk of having the accessory unguarded was not justified by some benefit in the design. The new design would do everything the old design would do but much safer.

Those are the basic reasons why, from the engineering viewpoint, the design was defective.

Deere further argues that the testimony of Dr. Stark in relation to using an electromyographic device to determine if a patient was in pain was impermissible, as it was essentially "lie detector" testimony. Dr. Stark testified that this test examines electrical movement of the skin. He further stated it is a test for emotional reaction. The court at the time of ruling, as it is now, is not persuaded that the test administered by Dr. Stark is a "lie detector" test; it was a test used in Dr. Stark's evaluation of the plaintiff. Deere's arguments against the admissibility of the witnesses' testimony went to the weight of the testimony rather than to the admissibility. As such, the objection was, and is, overruled.

After a review of the testimony of both of these witnesses, the court finds that their testimony was proper under the Rules. Under the Federal Rule of Evidence 704, an expert may render an opinion on an ultimate issue, but the testimony must be useful to the trier of fact. *Strong v. E.I. Dupont de Nemours Co., Inc.*, 667 F.2d 682 (8th Cir.1981). Accordingly, this portion of the motion for new trial is denied.

(13) The court erred in admitting deposition and trial testimony of witnesses from other lawsuits, who did not testify in the present case, who were not unavailable within the meaning of Federal Rule of Evidence 804.

■ Deere argues that the court erred in allowing the plaintiff to read portions of the depositions of Bichel, Slavens and Hitzhusen. Deere's argument is two-pronged: Either the prior testimony is hearsay which does not fit within an exception under Federal Rule of Evidence 804, or plaintiff failed to make an adequate showing that Deere had a similar motive in the proceedings from which the testimony was taken.

The court notes that the testimony of Mr. Bichel and Mr. Slavens was taken from the *Christopherson* case that was heard before this court, and that the testimony of Mr. Hitzhusen was taken from the *Wheeler* case. As noted above, these men are or were Deere employees who had extensive knowledge of the Titan series combine.

As noted above, Deere, for tactical purposes, chose not to have any representative in the courtroom during trial, or to call any other witnesses except for its expert, Dr. Clarey. This court, having now been involved with two of these cases, and having done a through review of Judge Kelly's findings in his post-trial motion in the *Wheeler* case, finds that Deere had a similar motive in each of the proceedings to develop the testimony of these witnesses. The court finds that no error was committed in allowing the plaintiff to use the sworn testimony of these Deere employ-

ees.[33] Accordingly, this portion of the motion for new trial is denied.

(14) The court erred in receiving into evidence a selected excerpt from Deere safety policy statement.

■■■ Deere argues that it was error to admit an excerpt of exhibit 21A, from Deere's safety policy statement which stated:

"Eliminate or reduce the hazard insofar as is possible without a) unreasonable impairment of equipment function, and/or b) unreasonable cost relative to the total cost of equipment and seriousness of the hazard."

Plaintiff argues that this evidence was not used to hold Deere to a higher standard, but to demonstrate that Deere did not abide by its own standards in designing this combine.

The court in ruling on the admissibility rejected Deere's claims that the admission of this policy statement would hold Deere to a higher standard than the law required. In ruling, this court found that this safety statement was a mere "platitude."[34] The court still believes so. Any perceived prejudice was clearly cured by the court's Instruction No. 16, which stated:

You have received evidence with respect to standards. You are instructed that such standards in and of themselves do not create the appropriate legal standard of care. Rather, the standard of conduct to be followed by any party shall be given to you as a matter of law in these instructions. If you find that the defendant did comply with these standards, then you may consider this as evidence, although not conclusive, that Defendant Deere did not produce a defective and unreasonably dangerous combine. Likewise, if you find that Defendant Deere did not comply with the standards, then you may consider this as evidence, although not conclusive, that Defendant Deere did produce a defective and unreasonably dangerous combine.

You have also heard evidence concerning "industry customs and standards." These "customs" may be considered by you in the same manner as set out above for standards.

Accordingly, this portion of the motion for new trial is denied.

(15) The court erred by permitting reference by plaintiff's counsel to punitive damages and Deere's net worth in opening statement, and in generally permitting comment upon the evidence of Deere's post-sale conduct prior to the time the court determined plaintiff had established a sufficiently submissible prima facie case as required by Iowa Code § 668A.1(3), and in permitting improper closing argument including a "golden rule" argument.

■■■ Deere argues that the court erred by permitting plaintiff's counsel to discuss punitive damages in his opening statement and make reference to Deere's net worth. Before selection of the jury, the court spelled out on the record its policy toward the mentioning of punitive damages before a determination of a prima facie case has been established. The following is an excerpt from the trial transcript:

Tr. p. 29, line 21—p. 30, line 14.

COURT: Well, I've told you before, but I'll say it on the record. I always tell lawyers that you start talking about punitives at your own peril, that I'm smart and I'm good looking, but I cannot decide whether or not, as Mr. Wilson just asked me to, if there is a case, until I hear it. And so I'm not going to say ahead of time that I'm not going to submit punitives or I'm going to submit punitives. If it's fairly close to the Burke case—excuse me, the Christopherson case, then I may well do it. But I'm not going to say, all right, I

**33.** These Deere employees or ex-employees were outside the subpoena power of this court. From past experience in cases similar to this case, plaintiff's counsel was able to convince the court that a possibility existed that these witnesses may not be called by Deere and that transcripts of prior testimony under oath should be allowed to be used.

**34.** Tr. at 999 lines 21–24.

think it's something that's going to be submitted now.

Tr. p. 32, line 24—p. 33, line 12:

COURT: All right. I'm reading this now. This is 668A.1, paragraph 3. "The mere allegation or assertion of a claim for punitive damages shall not form the basis for discovery of the wealth or ability to respond in damages on behalf of the party from whom punitive damages are claimed until such time as the claimant has established that sufficient admissible evidence exists to support a prima facie case establishing the requirements of subsection 1, paragraph a."

What that tells me, and maybe I'm missing something, is that you cannot force the defendant to turn over what their wealth is until such time as the judge has said that it seems to me like there's a prima facie case. Isn't that what it says, Mr. Wilson?

MR. WILSON: Yes, sir.

It was the court's belief, which Deere's counsel agreed with, that Deere was not required to turn over information on its net worth until such time as the court determined that a prima facie case has been made.[35] In the final remarks of his opening statement, plaintiff's counsel stated:

And so, ladies and gentlemen of the jury, I want to tell you that the evidence will show and we think will justify an award of one percent of Deere's savings account. The evidence will be that that will be 278 million 331,000 dollars to get their—to punish them. Thank you for your patience, ladies and gentlemen.[36]

This is the only reference to Deere's net worth that can be found in plaintiff's opening statement.

In further discussion on the subject of punitive damages, the court stated (still prior to plaintiff's opening statement):

Tr. p. 58, line 17—p. 59, line 12.

COURT: ...

We've got to make some rules for right now. I have not said—I told you I would probably give punitives, but it isn't a cinch yet. I want to hear this case. I want to have a little better idea of what this guy really faced. But for the purpose of an opening statement, you can talk about punitive damages and you can talk about things that would make it legal malice, but you can't talk about anything that happened after his injury with the understanding that that does not foreclose you from introducing evidence later or exhibits later. We're not just crossing that bridge finally, but we're crossing it—because I've told you already that people who talk in opening statements about punitives do so at their own risk. And it's my considered judgment, and I've tried a lot of cases, that if I'm going to get punitive damages from a jury that I can get just as much punitive damages if I never mentioned it until final argument as if I mentioned it early on. And I may be wrong, and Mr. Sellers can have his own opinion, but for now, the motion in limine to keep in opening statement from talking about things that have happened that were nasty that Deere did after the date of Burke's injury will be sustained. That's only a temporary sustaining.

Thus the court clearly did not allow plaintiff's counsel to comment on defendant's post-sale conduct during the opening statement. Deere also argues, under its 15th contention, that in his closing argument plaintiff's counsel violated the "Golden Rule". The portion of the plaintiff's closing argument objected to was as follows:

And I'm going to tell you something, ladies and gentlemen. This morning

---

**35.** A review of the trial transcript reveals that approximately midway through plaintiff's case the parties stipulated to Deere's net worth. (Tr. at 1252–53)

**36.** Before plaintiff's opening statement, plaintiff's counsel had been told that pursuant to Iowa Code 668A, he could not discover from Deere what its net worth was. This court followed the statute. Where plaintiff's counsel got his 278 million dollar figure is not made clear in the record. He certainly didn't get it from Deere, by order of this court, as the court had not yet directed Deere, through the discovery process, to give it to him.

when I got up—I have got a favorite suit or two, but I didn't wear them this morning. I wore black. Black. And I will tell you why I wore black. I was thinking about Mr. Takacs. I was thinking about the John Does, I was thinking about your relatives, sons and fathers unsuspecting, see that are yet to be, the tragedies, that are yet to be. (Tr. at 2477)

It is this court's understanding that a "Golden Rule" argument is an argument that asks the jurors to place themselves into the shoes of the plaintiff and do unto him as they would have him do unto them under similar circumstances. *See Ivy v. Security Barge Lines, Inc.,* 585 F.2d 732, 741 (5th Cir.1978). It is also a request to jurors to award such damages as they would wish if they were in a similar position. *Russell v. Chicago, Rock Island & Pacific R.R.,* 249 Iowa 664, 86 N.W.2d 843 (1957); *Klotz v. Sears, Roebuck & Co.,* 267 F.2d 53 (7th Cir.), *cert. denied,* 361 U.S. 877, 80 S.Ct. 141, 4 L.Ed.2d 114 (1959).

Argument of counsel is a procedural question to be determined by federal law. *Illinois Central R.R. v. Staples,* 272 F.2d 829 (8th Cir.1959). To constitute reversible error, statements made in oral arguments must be plainly unwarranted and clearly injurious. *Homan v. United States,* 279 F.2d 767 (8th Cir.1960). It is a fundamental belief in the Eighth Circuit that jurors are intelligent, discerning people and that they can usually sort out emotional and passionate arguments and follow what the court tells them to do. *Vanskike v. Union Pacific R.R,* 725 F.2d 1146, 1149 (8th Cir. 1984).

After a careful review of the trial transcript and the parties' written briefs, the court finds that although this argument comes close to being a "golden rule" argument, its effect was not unduly prejudicial nor clearly injurious, and any error was harmless at best. Accordingly, this portion of the motion for new trial is denied.

(16) The court erred in failing to instruct the jury that the condition of the combine and Deere's liability was to be judged solely as of the time of the initial sale of the combine in 1980.

██ In the court's Instruction No. 10,[37] the court charged the jury that:

In order to recover on the claim of strict liability, the plaintiff must prove all of the following propositions:

1. The defendant Deere sold the combine.

2. The defendant Deere was engaged in the business of selling combines.

3. *The combine was in a defective condition at the time of sale.*

4. The defective condition was unreasonably dangerous to the Plaintiff Clair Burke.

5. The plaintiff used the combine in the intended manner or in a manner reasonably foreseeable by Defendant Deere.

6. The combine was expected to and did reach the user without substantial change in its condition.

7. The defect was a proximate cause of plaintiff's damages.

8. The amount of damages.

If the plaintiff has failed to prove any of these propositions, the plaintiff is not entitled to damages. If the plaintiff has proved all of these propositions, then you will consider the defense(s) of Defendant Deere as explained in Instructions Nos. 19, 20, and 26. (emphasis added)

A review of the instruction shows that the court clearly instructed that the defect had to be present at the time of the sale. The evidence supports the jury finding that it was. As for failure to warn, the court has previously discussed the continuing duty to warn (see pages 1243–47). Accordingly, this issue in the motion for a new trial is denied.

(17) The court erred in permitting live and deposition testimony of the other injured persons and owners.

This point of alleged error has been discussed on pages 1248–49 of this order, and is denied for the same reasons. According-

---

**37.** Instruction No. 10 is Iowa Civil Jury Instruc- tion 1000.1.

ly, this portion of the motion for new trial is denied.

(18) The court erred in submitting future medical expenses as an element of plaintiff's damages where there was insufficient evidence to support submission of them.

Deere fails to address this point in its brief; however, after a review of the evidence, the court finds that sufficient evidence was presented to support the submission of this claim. Accordingly, this portion for the motion for new trial is denied.

(19) The court erred in giving an erroneous, prejudicial and argumentative jury instruction on pain and suffering which over-emphasized this element of damages.

■■■■ Deere argues that Instruction No. 30 is prejudicial, repetitious and only serves to over-emphasize this element of damages. In support of its position, Deere once again cites to the court the *Report on Civil Jury Instructions* by the Iowa Defense Counsel Association Task Force. As noted above, the court became aware of this report some six weeks following the trial. If counsel for Deere knew of it earlier, they did not so inform the court. Its proposed replacement for the instruction given is of little value. Instruction No. 30 [38] includes in part:

4. Physical and mental pain and suffering may include, but is not limited to, unpleasant feelings, bodily distress or uneasiness, bodily suffering, sensations, or discomfort.

Mental pain and suffering may include, but is not limited to, mental anguish, worry, anxiety, disappointment, depression, apprehension, embarrassment, loss of enjoyment of life, a feeling of uselessness, or emotional distress.

The Defense Counsel's report focus was to, at some time in the future, persuade the drafters of the Iowa Uniform Jury Instructions to change Instruction 200.12 as follows:

As one element of damages, the plaintiff claims damages for pain and suffering. Damages for pain and suffering are not confined to physical pain, but may include mental anguish which may arise from physical injury.

Damages for pain and suffering cannot be measured by any exact or mathematical standard, but must rest in your discretion based on a fair and impartial consideration of the evidence.

It appears that the Iowa Defense Counsel Association has been partially successful in persuading the drafters of the Iowa Uniform Jury Instruction to change Instruction 200.12. In July, 1991, 200.12 was changed to the following:

Physical and mental pain and suffering may include, but is not limited to, bodily suffering or discomfort.

Mental pain and suffering may include, but is not limited to, mental anguish or loss of enjoyment of life.

A review of the Transcript at page 2404–05 reveals that in discussing this instruction the court removed four state-of-mind examples from the above list that plaintiff admitted did not apply to his case.[39] As a result of these deletions, the court finds that this instruction, although it has subsequently been changed, was not erroneous, prejudicial or argumentative. Accordingly, this portion of the motion for new trial is denied.

(20) The verdict is against the weight of the evidence.

This point of alleged error has been discussed on pages 1249–52 of this order, and is denied for the same reasons. Accordingly, this portion of the motion for new trial is denied.

THEREFORE IT IS ORDERED that Deere's motion for judgment notwithstanding the verdict is denied.

IT IS FURTHER ORDERED that Deere's motion for a new trial pursuant to Federal Rule of Civil Procedure 59 is denied if within twenty days of the date of this order the plaintiff consents to a remittitur as to

---

**38.** Instruction No. 30, paragraph 4, is Iowa Civil Jury Instruction 200.12.

**39.** Those four were: irritability, confusion, disorientation, and nervousness.

the punitive damage award of $28,000,000. If plaintiff does not consent to such remittitur this court will vacate judgment and a new trial will be granted.